

**Harris County, Texas**

**Commissioners Court**

Request for Court Action

1001 Preston St., Suite 934
Houston, Texas 77002

---

**File #:** 22-1031                  **Agenda Date:** 2/8/2022                  **Agenda #:** 161.

---

**Department:** Sheriff
**Department Head/Elected Official:** Ed Gonzalez, Harris County Sheriff

**Regular or Supplemental RCA: Regular RCA**
**Type of Request:** Interlocal Agreement

| | YES | NO | ABSTAIN |
|---|---|---|---|
| Judge Lina Hidalgo | ☑ | ☐ | ☐ |
| Comm. Rodney Ellis | ☑ | ☐ | ☐ |
| Comm. Adrian Garcia | ☑ | ☐ | ☐ |
| Comm. Tom S. Ramsey | ☑ | ☐ | ☐ |
| Comm. R. Jack Cagle | ☐ | ☑ | ☐ |

**Project ID** (if applicable)**:** N/A
**Vendor/Entity Legal Name** (if applicable)**:** N/A
**MWDBE Participation** (if applicable)**:** N/A

**Request Summary (Agenda Caption):**
Request for approval of an interlocal agreement with the Harris County Hospital District, dba Harris Health System, for the transition of correctional health care services.

**Background and Discussion:**
On December 15, 2020, Commissioners Court assigned the Office of Management and Budget (OMB) to collaborate with the Harris Health System (HHS) and the Harris County Sheriff's Office (HCSO) on an evaluation of transitioning jail medical care from HCSO to HHS. After a review, all parties agreed that the transition was feasible, would improve care for incarcerated persons, and aligned with policy objectives. HHS's proposed service delivery model optimizes service delivery through enhancement of telemedicine and bringing providers to the jail. An initial plan for the transition of these services was presented to Court on September 28, 2021. This interlocal agreement codifies the transition plan for the target date of March 1, 2022 for transition of care.

**Expected Impact:**
The quality of Health care services for detainees should improve when overseen by HHS. The financial impacts of the transition are presented in the recommended budget. The full-year adjusted budget for jail medical is projected to increase from $87 million in 2021-2022 to $95 million in the 2022-2023 Planning Budget. While this increase is significant, potential costs savings over the next 18 months include reduced spending with third party healthcare providers like Memorial Herman and St. Josephs based on increased telemedicine, reduced staffing costs based on fewer movement of detainees, and lower drug prices.

**Alternative Options:**
Court could choose for inmate care to remain under the management of HCSO.

Presented to Commissioners Court

February 8, 2022

**Alignment with Goal(s):**

    X Justice and Safety
    _ Economic Opportunity

Approve: R/E

---

**File #:** 22-1031                    **Agenda Date:** 2/8/2022                    **Agenda #:** 161.

_ Housing
X Public Health
_ Transportation
_ Flooding
_ Environment
_ Governance and Customer Service

**Prior Court Action** (if any)**:**

| Date | Agenda Item # | Action Taken |
|---|---|---|
| 09/28/2021 | 245 | HCSO Correctional Care Transition Plan presented to Court |
| 06/29/2021 | 188 | Progress memo transmitted to Commissioners Court |
| 04/13/2021 | 96 | Progress memo transmitted to Commissioners Court |
| 12/15/2020 | pg. 32, 24.b.2 | Order to begin transition planning and feasibility assessment |

**Location:**
Address (if applicable): N/A
Precinct(s): Countywide

| Fiscal and Personnel Summary | | | |
|---|---|---|---|
| Service Name | | | |
| | **FY 21-22** | **FY 22** | **Next 3 FYs** |
| **Incremental Expenditures (do NOT write values in thousands or millions)** | | | |
| Labor Expenditures | $ | $ | $ |
| Non-Labor Expenditures | $ | $ | $ |
| **Total Incremental Expenditures** | $ | $ | $ |
| **Funding Sources (do NOT write values in thousands or millions)** | | | |
| Existing Budget | | | |
| Choose an item. | $ | $ | $ |
| Choose an item. | $ | $ | $ |
| Choose an item. | $ | $ | $ |
| Total Current Budget | $ | $ | $ |
| Additional Budget Requested | | | |
| Choose an item. | $ | $ | $ |
| Choose an item. | $ | $ | $ |
| Choose an item. | $ | $ | $ |
| Total Additional Budget Requested | $ | $ | $ |
| **Total Funding Sources** | $ | $ | $ |
| **Personnel** (Fill out section only if requesting new PCNs) | | | |
| Current Position Count for Service | - | - | - |

**File #:** 22-1031                **Agenda Date:** 2/8/2022                **Agenda #:** 161.

| | | | |
|---|---|---|---|
| Additional Positions Requested | - | - | - |
| **Total Personnel** | - | - | - |

**Anticipated Implementation Date:** March 1, 2022

**Emergency/Disaster Recovery Note:** Not an emergency, disaster, or COVID-19 related item

**Contact(s) name, title, department:** Mike Lanham, HCSO; Jesse Dickerman, Chief of Staff, Office of County Administration

**Attachments** (if applicable)**:**

**INTERLOCAL COOPERATION AGREEMENT BETWEEN HARRIS COUNTY
AND THE HARRIS COUNTY HOSPITAL DISTRICT
D/B/A HARRIS HEALTH SYSTEM FOR
CORRECTIONAL HEALTH CARE SERVICES**

THIS INTERLOCAL AGREEMENT (the "Agreement") is entered by and between Harris County ("County"), a body corporate and politic under the laws of the State of Texas, acting on behalf of the Harris County Sheriff's Office ("HCSO"), and the Harris County Hospital District d//b/a Harris Health System ("Harris Health"), a political subdivision of the State of Texas, pursuant to the authority granted and in compliance with the provisions of the "Interlocal Cooperation Act", Texas Government Code, Chapter 791 *et. seq*. The County and Harris Health are referred to collectively as the "Parties" and individually as a "Party".

**RECITALS**

WHEREAS, the County owns five detention facilities ("Detention Facilities") which are under the supervision and control of the Sheriff of Harris County ("Sheriff"); and

WHEREAS, the Sheriff is charged by law with the responsibility for obtaining and providing adequate medical care for detainees of the County's Detention Facilities (each such facility generally referred to as the "Jail"); and

WHEREAS, the Sheriff desires to outsource the provision and supervision of medical and mental health care (generically, "health care") to a qualified care provider; and

WHEREAS, Harris Health routinely treats detainees at its hospitals -- Lyndon B. Johnson Hospital and Ben Taub Hospital -- for emergency medical conditions; and

WHEREAS, Harris Health has experience evaluating whether health care services are being provided in a safe and effective manner; and

WHEREAS, the Interlocal Cooperation Act permits an existing local government to supervise the performance of an interlocal contract between other local governments; and

WHEREAS, the purpose of the Interlocal Cooperation Act is to increase the efficiency and effectiveness of local governments; and

WHEREAS, the County and Harris Health believe that health care for detainees may be more effective if provided and/or overseen by Harris Health through this Interlocal Agreement; and

WHEREAS, in compliance with the Interlocal Cooperation Act, each Party has received the approval of its governing bodies prior to executing this Agreement.

NOW THEREFORE, and in consideration of the mutual promises contained in this Agreement, the County and Harris Health mutually agree as follows:

## ARTICLE 1. PURPOSE; SERVICES

A. **Purpose.** The purpose of this Agreement is to outline the responsibilities that each Party will undertake to ensure that detainees are provided with adequate and quality health care services in compliance with applicable laws, rules, regulations, and standards.

B. **Services.** In addition to routine medical services, the medical care and ancillary services to be provided by Harris Health are those described in Attachments B-1 through B-13, including the following:
   a. Dental Care
   b. Laboratory and Radiology Services
   c. Urgent Care
   d. Obstetrical Care
   e. Medical Detoxification Services
   f. Long-Term Convalescent Care
   g. Pharmacy Services
   h. Care Coordination and Case Management Services
   i. Optometry (collectively with routine health care services, the "Services").

Any medical care services that are not described in Attachments B-1 through B-13 are expressly excluded from this Agreement, as further detailed in Attachment B-14, entitled Services Not Covered. Mental health care services will continue to be rendered by the Harris Center, and Harris Health's responsibility with respect to such services is outlined in Attachment B-4.

## ARTICLE 2. HARRIS HEALTH'S RESPONSIBILITIES

A. **Staffing.** Harris Health will employ, or contract with certain nonprofit and/or state medical schools for, physicians and advanced practice professionals (collectively, "medical staff") who are duly licensed by the appropriate examining boards in the State of Texas and qualified to provide medical assessment and other Services. As part of the hiring and selection process, all medical staff will undergo primary source verification and physicians will be queried through the National Practitioner Data Bank (NPDB). If, at any point during the term of this Agreement, Harris Health becomes aware that a member appointed to its medical staff and assigned to the Jail is indicted for a felony or that a physician has an adverse action reported by the NPDB, Harris Health will immediately notify the Sheriff.

B. **Pre-Custody Assessment.** Harris Health will assist the Sheriff in determining the health status of a potential detainee and advise whether the detainee's health status would allow the Sheriff to take the detainee into custody (when potential detainee's condition is not an emergency) or warrant the potential detainee being re-routed to a hospital for medical tests and treatment.

C. **Environmental Services.** Harris Health will clean Jail medical areas (e.g., infirmaries, clinic space, health assessment and triage rooms, and laboratories) in accordance with the applicable portions of Exhibit B-15. For avoidance of doubt, Harris Health will not assume responsibility for cleaning the Inmate Processing Center or transitional medical housing unit(s) and will not

provide biomedical waste disposal or perform any cleaning task that Appendix A to Exhibit B-15 identifies as the sole responsibility of a non-Environmental Services (non-EVS) department.

D. **Advice upon Detainee's Release from Custody.** Harris Health will inform the Sheriff when, on the scheduled date of a detainee's release from the custody of the Sheriff, the detainee requires continued health services in a hospital or long-term care facility setting post-release, so that the Sheriff can arrange for transportation to the appropriate facility. Harris Health will not assume any liability or responsibility for care rendered on or after a detainee's release by a hospital or long-term care facility or for the physical transportation of such released persons to hospitals and long-term care facilities. Notwithstanding the foregoing, Harris Health will be responsible in accordance with and to the limits of the Texas Torts Claims Act for care rendered to former detainees at a Harris Health facility. The preceding sentence is not intended as, and shall not be construed to be, an express or implied acceptance by Harris Health of liabilities arising because of actions that lie in tort or could lie in tort in excess of the liabilities allowable under the applicable governmental immunity laws.

E. **Comply with Laws, Rules, and Standards.** In providing the Services, Harris Health will comply with the following:

1. **Applicable Jail Standards**

   a. <u>Texas Commission on Jail Standards (TCJS) Plan.</u> Harris Health will provide a health care delivery system to detainees in the Jail in accordance with the Texas Commission on Jail Standards' health-related jail standards (*see e.g.*, 37 Tex. Admin. Code §§ 273.1-273.7) and the Health Services Plan (Attachment A-1).

   b. <u>NCCHC.</u> Harris Health will observe all essential standards within the National Commission on Correctional Health Care (NCCHC) manual that the Sheriff currently meets. If there are any constraints, contractual or otherwise, that prevent Harris Health from meeting the standards of the NCCHC, Harris Health will notify the Sheriff of those constraints. In the event that the Sheriff applies for re-accreditation under the standards of the NCCHC, Harris Health will cooperate fully with the Sheriff in seeking accreditation and ensuring compliance (once accredited) with NCCHC standards.

   c. <u>ACA.</u> In the event that the Sheriff applies for accreditation under the standards of the American Correctional Association (ACA), Harris Health will cooperate fully with the Sheriff in seeking ACA accreditation. In the event that the Sheriff obtains accreditation by the ACA, Harris Health will observe ACA standards and will cooperate fully with the Sheriff in ensuring compliance with ACA standards. If there are any constraints, contractual or otherwise, that prevent Harris Health from meeting the standards of the ACA, Harris Health will notify the Sheriff of those constraints.

   d. <u>OFDT.</u> If, at any point during the term, the Sheriff accepts federal detainees, Harris Health will comply with the health care standards within the Federal Performance-Based Detention Standards Handbook that are consistent with the essential NCCHC standards. The Office of Federal Detention Trustees publishes the handbook.

2. **Applicable Federal Law**

   a. <u>Prison Rape Elimination Act (PREA).</u> To the extent applicable to Harris Health, Harris Health's medical staff and subcontractors will comply with the Sheriff's PREA policy available at https://hcsopolicy.com/policy/.

   b. <u>Nondiscrimination.</u> Treatment will be provided to detainees without regard to gender, age, race, color, national origin, religion, creed, sexual orientation or identification, or disability.

   c. <u>Patient Confidentiality.</u> Harris Health and the County acknowledge that Harris Health is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), codified at 42 U.S.C. §§ 1302d through 1302d-8, and as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act"), and County has determined Harris Health is not acting as a business associate of the County when rendering Services. County further agrees to release and waive any claim it may have against Harris Health with respect to the use, disclosure, maintenance, storage, and transmission of health information, including but not limited to any violations of the HIPAA Administrative Simplification provisions at 45 C.F.R. Parts 160 - 164.

3. **Applicable State Law**

   a. <u>Informed Consent.</u> Harris Health will ensure that all detainees receiving treatment within the Jail facilities are appropriately informed as to medical procedures and appropriate consent will be obtained by Harris Health prior to providing such medical procedures. Documentation shall indicate when a detainee has refused consent.

   b. <u>Medical Records.</u> Harris Health will create and maintain complete and accurate medical records within the electronic medical record (EMR) for each detainee, beginning with the detainee's initial assessment. The medical records shall be kept separate from the detainee's confinement record. The EMR and the medical records of detainees treated pursuant to this Agreement are and will remain the property of the County. Any subpoena or request for medical records of detainees will be handled by the County through the Sheriff's legal counsel.

   c. <u>Notification to Health Authorities.</u> Harris Health will report the presence of all communicable diseases which require reporting to local and state health authorities; however, Harris Health will have no obligation to perform testing ordered by the Department of State Health Services or the local health authority on a law enforcement, correctional officer, or Harris County employee, contractor, or volunteer who performs a service in the Jail.

4. **Applicable Licensing Board Rules**

   a. <u>Licensing of Professionals</u>. All medical staff, including subcontractor personnel, who perform Services that require a medical, nursing, or pharmacy license shall be licensed by the appropriate examining board in the State of Texas and shall maintain their licenses throughout the term of this Agreement. Medical staff, including subcontractor personnel, will also maintain valid credentials, clinical certifications, and operate only within the limits of their clinical privileges. Harris Health will ensure that credential files are maintained in accordance with all appropriate standards.

   b. <u>CPR Training</u>. Harris Health personnel, including clerical workers, and all medical staff will be certified in Cardiopulmonary Resuscitation (CPR).

5. **Written Procedures.** Harris Health will propose modifications to supplement the Sheriff's existing procedures for the following Services: (a) sick calls; (b) medical services, including obstetrical and gynecological care; (c) emergency care; (d) long-term and convalescent care; and (e) telehealth services. All proposed modifications will be provided to the Sheriff for review at least 30 days prior to the date on which the Sheriff intends to submit its Health Services Plan to the Texas Commission on Jail Standards.

F. **<u>Collaborate and Coordinate with Federal Agencies, Bureaus, and Other Medical Providers</u>**

1. **Outside Medical Providers.** Harris Health will coordinate its Services with other medical providers who have agreed, or are otherwise under contract with Harris County, to provide care to detainees, including but not limited to the Harris Center and with community resources.

2. **Federal Bureau of Prisons.** All off-site medical care provided to federal detainees must be pre-approved by the federal government. In the event of an emergency, Harris Health shall proceed immediately with the necessary treatment and will notify the Sheriff regarding the nature of the federal detainee's illness or injury as well as the types of treatment provided. Federal detainees include individuals charged with federal offenses and detained in a Harris County Jail while awaiting trial, individuals who have been sentenced and are awaiting designation and transport to a Bureau of Prisons facility, and individuals who are awaiting a hearing on their immigration status or deportation.

G. **<u>Review Quality, Morbidity, Mortality, and Cost.</u>**

1. **Continuous Quality Improvement Committee.** Harris Health will require physicians appointed to its medical staff to review patient charts regularly and after acute care hospital admissions or medical emergencies. Harris Health will also require physicians appointed to its medical staff to participate on the Quality Improvement Committee (QIC) established by the Joint Operating Committee (see Article 5) to monitor the delivery of high-risk, high-volume or problem-prone aspects of health care and to identify and address deficiencies

through the implementation of a corrective action plan designed to improve the safety and quality of care. The Sheriff will designate a Sheriff's Office employee to serve on the QIC.

2. **Utilization Review.** Harris Health will perform utilization review and engage in utilization management activities to ensure that all scheduled health services are appropriate. At a minimum, utilization review will involve analysis of the number of no-shows for health services, outside hospitalizations, physician hours, and utilization of the infirmary.

3. **Morbidity and Mortality Review.** When requested by the Sheriff or his designee, Harris Health will review any detainee death that occurs up to seventy-two (72) hours after the detainee has received Services, unless such death is suspected to have resulted from the use of force by County employees. Should Harris Health's review reveal that the cause of death is due to its Services, or the lack thereof, it will take necessary corrective action to prevent similar deaths from happening in the future.

4. **Other Reviews.** When requested by the Sheriff or his designee, Harris Health will provide its review relating to a health care complaint made by or on behalf of a detainee.

5. **Cost Containment.** Harris Health will continuously review resource utilization and operations in an effort to detect opportunities for cost containment and will track its actual operating costs against its budgeted operating costs each month. The Sheriff or his designee will be informed when actual operating costs exceed those budgeted, so that the Sheriff can begin discussions with the County Budget Office.

H. **Perform Background Checks; Security.** Harris Health acknowledges that any employee or long-term contractor who requires frequent access to housing areas within the Jail must pass a security clearance background check that screens for felony convictions, misdemeanor convictions within the three (3) year period prior to the date of the background check or which involve the delivery of drugs, or open warrants and charges related to crimes against a person. Harris Health agrees that access to the housing areas of each Jail will be denied to any applicant who fails the background checks. Harris Health will adhere to all security procedures as set by the Sheriff.

I. **Employee Training and Orientation.** Harris Health will onboard employees using the onboarding procedures applicable to new staff, returning staff, staff who change roles, or transfer to a new clinical area. However, Harris Health will also require its employees and subcontractors to attend institutional familiarization training and other required annual training hosted by the Sheriff's Office.

J. **Detainee Grievance/Complaints.** Harris Health will respond to detainee complaints regarding the provision of Services within the time frame set forth in the grievance procedures established by the Sheriff's Office. However, Harris Health shall have no obligation to consider such complaints using the process it has established pursuant to 42 C.F.R. § 482.13 for the prompt resolution of grievances against its hospitals.

**K.** **Medical Recordkeeping and Reports.** The Sheriff is the legal custodian and owner of all medical records; however, for the term of the Agreement, Harris Health is the delegated custodian and will create and maintain new medical records for detainees and update active medical records for detainees.  Such records shall be accessible to health care personnel who (i) are assigned to render services to detainees of the Jail, including employees of Harris Center, and (ii) accept the referral of patients for treatment that is not available from Harris Health or in the Jail. Harris Health will not update medical records to reflect Mental Health Services.

**L.** **Financial Reports**.  Harris Health will prepare and present a financial report to the Joint Financial Steering Committee no later than 30 days after the end of each month.  This report will include financial performance statistics that allows the Joint Financial Committee to compare the Payment Period budget against actual expenses to-date and total projected expenses.

**M.** **Non-Capital Equipment Purchases.** Harris Health may purchase certain equipment and accessory items, having a cost of less than $5,000, to augment existing equipment if such equipment or accessory item is necessary to perform the Services and functions described herein or to operate the health care facilities in compliance with TCJS or NCCHC standards. All equipment purchased by Harris Health using County funds will become the property of the County at the termination of the Agreement.

**N.** **Use of Resources.** With the exception of emergency services, Harris Health will perform Services inside the Jail whenever possible, and will only perform services off-site when, in the professional judgment of Harris Health's medical staff, resources within the Jail facilities are insufficient to provide appropriate medical care.  Harris Health will maintain a log and provide a quarterly report to the Sheriff regarding the number of patients transported off-site for Services, where they were transported and the reason why they were sent off-site. County and Sheriff understand that Harris Health has no discretion in where the Houston Fire Department may transport a patient who is experiencing a medical emergency and further that, in certain instances, Harris Health's hospitals may be on diversion status.

## ARTICLE 3. HARRIS COUNTY AND HARRIS COUNTY SHERIFF RIGHTS AND RESPONSIBILITIES

**A.** **Responsibilities of Harris County**

1. **Provision of Space and Utilities.** County will provide Harris Health with water, gas, heat, light, power, internet, and other utilities other than long distance phone service at each Jail. County will also lease to Harris Health ("lessee") the space within each Jail that is for health services. Any lease executed between the Parties for this health care space will be executed separately pursuant to TEX. LOC. GOV'T CODE § 272.001(1) and will not contemplate the charging of cash rent to lessee, so long as lessee uses and occupies the space in accordance with the terms of said lease and for the purposes of providing the Services described herein.

2. **Payment for Services, Supplies, and Equipment.**

   a. Compensation Generally. As contemplated by the Interlocal Cooperation Act, the County intends to fairly compensate Harris Health for the Services, resources, supplies, and non-capital accessories and equipment it provides. The Parties agree that "fair compensation" means the actual cost to Harris Health to provide the Services, which would include personnel related costs and the purchase of medical supplies and non-capital equipment and accessories. Harris Health acknowledges, however, that payment of fair compensation is contingent upon the allocation of sufficient funds for this Agreement by the Harris County Commissioners Court.

   b. Determining Compensation. Except in cases of disagreement, fair compensation for each Payment Period (see definition in subsection e, below) will be recommended by the Joint Financial Steering Committee to the Harris County Commissioners Court through the Harris County Office of Management and Budget ("OMB") utilizing the same process that applies to the Sheriff's General Fund budget. Payment Periods and compensation are as follows:

      i. *Initial Payment Period.* Compensation for the period beginning on the Commencement Date and ending on September 30, 2022 ("Initial Payment Period") will be recommended prior to execution of this Agreement, and will not absorb payments that may be due to Harris Health or third parties for goods and services rendered prior to the Initial Payment Period. The total compensation payable to Harris Health in such period is referred to as the "Initial Payment Amount".

      ii. *Subsequent Payment Period.* Compensation for the period beginning on October 1, 2022, and ending on September 30, 2023, and each twelve month period thereafter (such periods "the Subsequent Payment Periods"), will be recommended by the deadline for County budget submissions. The total compensation payable to Harris Health in such period is referred to as the "Subsequent Payment Amount."

   c. Disagreement over Recommended Payment Amount. In the event that the Joint Financial Steering Committee is unable to agree on a recommended Payment Amount, the OMB will present the Commissioners Court with the documentation described in Article 4, paragraph C, section 3.

   d. Documenting Payment Amounts. The total compensation to be paid to Harris Health in any given Payment Period shall be stated in Harris County's annual budget, and all relevant budgets shall be considered affixed hereto without the necessity of amendment.

   e. Definitions. For purposes of this Agreement, the terms "Initial Payment Amount", and "Subsequent Payment Amount" are collectively referred to as the "Payment Amounts" and the terms "Initial Payment Period", and "Subsequent Payment Period" are collectively referred to as "Payment Periods." All Subsequent Payment Periods will be coterminous with the County's fiscal year.

f.  Payment Schedule. Harris Health shall receive one-fourth of the appropriate Payment Amount from Harris County within the first fifteen days of each quarter within the Payment Period, except during the Initial Payment Period, when payment will made be on the last day of months 1, 3, and 5. In no event shall County withhold payment of all or a portion of any quarterly Payment Amount; instead, when Harris Health's actual costs or performance is in question, County shall exercise its rights under the dispute resolution provisions contained herein.

g.  Annual True-Up; Remedies for Overpayment. Harris Health will ascertain its actual costs at the completion of every Payment Period. When Harris Health's actual cost is less than the County's payments to Harris Health for that period, Harris Health will reimburse any overpayment made in the prior Payment Period to Harris County within 90 days of the end of that Payment Period.

h.  Remedies for Payment Shortfall.
    i.  *During Payment Period.* If at any point during a Payment Period, Harris Health projects that actual costs will exceed the budget:
        a.  Harris Health will consult with the Sheriff to determine whether Services can be modified to reduce costs. If Services cannot be modified, the Joint Steering Committee will prepare and submit a presentation that explains why actual costs are projected to be higher than budgeted and Service reductions are not feasible.

        b.  The Sheriff will present the Joint Steering Committee's request for a budget amendment to the Harris County Commissioner Court. The County Commissioners Court will determine whether (1) current revenue is available to reimburse Harris Health for all its actual costs and (2) to approve a budget amendment. Absent a budget amendment, Harris Health will have the right to terminate this Agreement as described in Article 6.

    ii. *At the End of Payment Period.* If, at the end of any Payment Period, Harris Health has not received the entire Payment Amount owed or its actual costs exceed the Payment Period Amount, Harris Health may request funds in the amount of the unpaid Payment Amount or its unreimbursed costs, whichever is applicable, be included to the budget for the next County fiscal year. Where actual costs exceed the Payment Period Amount, Harris Health must submit justification for the overage and explain why it was not presented to County Commissioners Court in advance of the Payment Period's expiration. County Commissioners Court will determine whether there is current revenue available to pay Harris Health for this shortfall.

i.  Best Efforts Representation. The County agrees and hereby represents that it will put forth its best effort to include funds necessary to make Harris Health whole (i.e., funds in an amount equal to Harris Health's actual costs) in each fiscal year budget. The County further agrees that its failure to include the funds described in subsection f.ii of this section in its next fiscal year budget will entitle Harris Health to terminate this

Agreement for cause with 180 days' notice and to exercise and seek any other rights and remedies available to it under law or equity.

j. Tobacco Settlement Money. The Parties acknowledge and agree that Harris Health may, from time to time, receive monies from the Tobacco Settlement Permanent Trust Account (the "Tobacco Settlement Money") and that such Tobacco Settlement Money does not serve to satisfy the County's payment obligations under this section.

3. **Payment for Evacuation and Outside Medical Expenses.** County will pay Harris Health a mutually agreed amount for any additional expenses incurred by Harris Health on County's behalf in the event a natural disaster results in evacuation of the Jail facilities. The County will also be wholly responsible for the payment of all claims associated with services provided at non-Harris Health facilities, if any.

4. **Health Information Sharing.** In the event of any claim or lawsuit relating to patient care rendered by Harris Health under this Agreement, County will provide Harris Health with copies of pertinent medical records even after the termination of this Agreement for the purposes of defending litigation. The County will also participate in Greater Houston Health Care Connect, a health information exchange that facilitates timely access to medical records, and will form an Organized Health Care Arrangement ("OHCA"), as such term is defined under HIPAA, if requested by Harris Health.

5. **Information Technology Support.** County will require its Universal Services department ("HCUS") to provide timely and effective technical support to Harris Health, its medical staff, and subcontractors for HCUS supported software and information technology assets (e.g., routers, server infrastructure, switches, and telecommunications devices) that are used to provide Services or to connect to the local enterprise network. Service level agreements that define timely and effective support will be executed separately. Further, during the Initial Payment Period, the Sheriff will provide to Harris Health the same or similar technical support services as those currently being provided at the Jail for hardware and access authorization purposes, and the County will work to transition information technology support for computer hardware, specialized computerized equipment, and network endpoints from the Sheriff to HCUS. Harris Health's obligation during the Initial Payment Period will be to provide two (2) employees to help with the technical support services, onsite at the Jail, who will each work forty (40) hours per week under the direction and supervision of the Sheriff. The Sheriff has the right to refuse a request related to the technical support services.

B. **Responsibilities of the Harris County Sheriff**

1. **Health Services Plan.** The Sheriff is responsible for the drafting and updating of the Health Services Plan and Mental Disabilities/Suicide Prevention Plan attached hereto as Attachments A-1 and A-2. This includes the development of a mechanism for detainees to express their complaints regarding the provision of Services.

2. **Screening.** The Sheriff will obtain an Identity History Summary from the Federal Bureau of Investigation ("FBI") for each person who Harris Health assigns to a correctional health position that will have access to the FBI Criminal Justice Information System. A copy of this Identity History Summary shall be provided to Harris Health's Human Resources team at the following address:

Harris County Hospital District d/b/a Harris Health System
ATTN: Associate Administrator of Human Resources Health Services
P.O. Box 66769
Houston, TX 77266-6760

3. **Security.** The Sheriff shall be responsible for all aspects of security, including during transportation of detainees for medical treatment, whether in or outside the Jail. Harris Health shall have no responsibility for security within the Jail or for the custody or supervision of any detainee at any time, such responsibility being solely that of the Sheriff.

4. **Training.** The Sheriff will provide orientation and institutional training to Harris Health employees and subcontractors who have passed a background check. The orientation and training will cover Sheriff's Office Policy and Jail Policy, to include Administration, Facility Management, Professional Conduct, Ancillary Services, Medical Policy and Safety and Security.

5. **Transportation.** The Sheriff will pay for the transport of detainees by the Houston Fire Department and shall not bill the cost of such transport to Harris Health or reduce its Annual Payment Amount by the cost of such transport.

6. **Cooperation.** On matters of mutual concern, the Sheriff and the Sheriff's staff shall support, assist and cooperate with Harris Health, and Harris Health shall support, assist and cooperate with the Sheriff whose decision on any non-medical matter shall be final.

7. **Daily Census.** On a daily basis, no later than 8:30 AM., the Sheriff or his designee will provide Harris Health accurate information detailing the number, names and locations of detainees booked in and housed in the Jail.

8. **Access.** The Sheriff will provide detainees with access to medical and health care personnel to receive Services. In the event such health care is to be provided off-site, the Sheriff or his designee shall arrange appropriate transportation for that purpose, at no cost to Harris Health.

9. **Medical Supplies and Equipment; Capital Purchases.**
   a. *Prior to the Commencement Date.* The Sheriff shall cooperate with Harris Health to begin the process of procuring all medical supplies and equipment that Harris Health represented were necessary for Harris Health to render Services on the Commencement Date. The Sheriff hereby gives Harris Health permission to use any equipment currently in the health care facilities of each Jail.

b. *After the Commencement Date.* The Sheriff shall purchase or lease appliances, equipment, hardware, network and other computer-related equipment, fixtures, software, and other items that, individually or together with anticipated maintenance, have a cost of $5,000 or more ("Capital Purchases"). To the greatest extent possible, all proposed Capital Purchases shall be included in the budget recommended to the County Commissioners Court by the Joint Financial Steering Committee. Any Capital Purchases are and will remain the property of the County at the termination of the Agreement and will, therefore, be the responsibility of the County to maintain in good working order.

10. **Disposal of Biomedical Waste.** The Sheriff will make provisions for storage, collection, and removal of medical waste and sharps containers in accordance with state and federal regulations. The Sheriff will be responsible for the cost associated with biomedical waste removal.

11. **Sheriff Acceptance of Policies and Procedures.** The Sheriff will review and accept Harris Health's policies and procedures, if any, on the topics outlined below, unless they interfere with the discretion of the Sheriff to perform his/her responsibilities under law:
    a. Pharmaceutical drug and syringe security
    b. Alcohol and drug medical detoxification
    c. Identification, care and treatment for detainees with special medical needs, including but not limited to individuals with hepatitis, epilepsy or physical handicaps, those infected with the Human Immunodeficiency Virus (HIV), and those with any other diseases that are communicable.
    d. The use of physical restraints.

C. **Rights of the Harris County Sheriff**

1. **Medical Personnel.** If the Sheriff or his designee becomes dissatisfied with any Harris Health employee or member of its medical staff who performs Services hereunder (a "Named Individual"), then the Sheriff or his designee shall notify Harris Health of the reasons for its dissatisfaction (such notice a "Dispute Notice").
    a. The following reasons for dissatisfaction are grounds for immediate escalation to the appropriate senior level manager identified in Attachment B-13 (either the Chief Medical Officer for Correctional Health or the Administrative Director of Nursing), who will use his/her best efforts to resolve the problem:
        i. a felony indictment or information is filed against a Named Individual;
        ii. the commencement, filing, or delivery of any notice of formal inquiry into the Named Individual by the Texas Medical Board, the Texas Pharmaceutical Board, or the Texas Nursing Board
        iii. the reporting of certain adverse actions taken against the Named Individual by the NPDB;
        iv. allegations of one or more major, significant, or repetitive violations by a Named Individual of the Sheriff's policies on Employee Conduct;
        v. a Named Individual's violations of Jail Security protocols or directions; or

vi. a Named Individual's alleged negligence or deliberate indifference to the needs of detainees.

b. All other reasons for dissatisfaction will be referred for resolution to an ad hoc committee of four (4) persons, comprised of at least two (2) Harris Health representatives and two (2) Sheriff's Office representatives (the "HCP Dispute Committee").

i. Members of the HCP Dispute Committee are not permanent and are appointed for the purposes of a single Dispute Notice.

ii. If the HCP Dispute Committee has not been successful in resolving the dispute through good faith discussion and negotiation on or before the thirtieth (30th) day following receipt of the Dispute Notice by Harris Health, the Sheriff may request that the Harris Health Chief Strategy Officer attempt to resolve the Dispute in good faith within a period of thirty (30) days.

c. Nothing in this Agreement shall be interpreted to limit or otherwise restrict in any way Harris Health's authority to credential and approve or terminate the privileges of any Named Individual, whether employee or contractor, in accordance with its Medical Staff Bylaws or applicable law.

### ARTICLE 4. JOINT FINANCIAL STEERING COMMITTEE

A. **Formation.** The Parties shall form a Joint Financial Steering Committee to make recommendations to the County Commissioners Court through OMB concerning the Payment Amount.

B. **Composition.** The Joint Financial Steering Committee shall be composed of two (2) representatives from the Sheriff's Office, one (1) representative designated by the OMB, and two (2) representatives from Harris Health. The Sheriff's Office and OMB representatives may be collectively referred to herein as the "County Representatives".

C. **Scope of Authority.** The Joint Financial Steering Committee will propose an annual Payment Amount for inclusion in the County's budget, which amount shall reflect the Joint Financial Steering Committee's assessment of the funds needed to provide the Services in compliance with Article 2 or to improve such Services, whenever improvement is possible. In addition, the Joint Financial Steering Committee will be tasked with considering and making recommendations on one-time budget requests, including requests for emergency funding, Capital Purchases, and capital improvements. In the event the County Representatives cannot reach agreement with the other Joint Financial Steering Committee members concerning the Payment Amount to recommend or one-time budget requests, the following escalation process will be triggered:

1. A representative from the Sheriff's Office and a representative from Harris Health will meet to discuss the disagreement within ten (10) business days of the Joint Financial Steering Committee meeting at which the disagreement was discovered;

2. If the foregoing representatives are unable to reach agreement at the initial meeting, a subsequent meeting will be scheduled between the representatives within fifteen (15)

business days of the last meeting for the purpose of engaging in further good faith negotiation;

3. If, at the conclusion of the second meeting, the representatives have failed to reach agreement, the Sheriff shall submit HCSO's recommendation to the OMB with a separate attachment showing Harris Health's recommendation. The OMB will present each side's recommendation to the Commissioners Court for decision.

## ARTICLE 5. JOINT OPERATING COMMITTEE

A. **Formation**. The Parties will form a Joint Operating Committee.

B. **Composition**. The Joint Operating Committee will be composed of eleven (11) persons, five (5) of which are Harris Health representatives appointed by the Chief Medical Officer for Correctional Health, five (5) of which are County representatives appointed by the Sheriff, and one (1) representative of which is appointed by the dean of a medical school that is affiliated with Harris Health for the purpose of providing correctional health services. The Parties' representatives may, at any time, mutually agree in writing to change the number of members on, or the composition of, the Joint Operating Committee; provided, however, that no such change may result in the Parties having an unequal number of representatives on the Joint Operating Committee at any time.

C. **Scope of Authority**. Subject to any ultimate approval requirements or rights of the Board of Trustees or the County Commissioners Court pursuant to this Agreement or as otherwise required by law, the Joint Operating Committee will have authority to:
1. Amend and develop operational health policies and procedures;
2. Identify the type of medical and health care personnel needed to provide the Services;
3. Approve the staffing plan for medical and mental health services;
4. Develop and monitor performance metrics for the Services and for mental health services;
5. Form a Quality Improvement Committee to meet at least quarterly and complete two process quality improvement and outcome quality improvement studies per year;
6. Engage in quality improvement monitoring activities;
7. Recommend revision to the jail health services plan;
8. Request Capital Purchases by the County;
9. Evaluate whether renovations are necessary to current Jail health care facilities or network devices;
10. Make decisions regarding matters of personnel safety in the event of a lockdown or other emergency; and
11. Review and provide input on the acquisition, construction, design, and build of new health care facilities for detainees.

D. **Quorum and Voting**. The quorum for any meeting of the Joint Operating Committee will be three (3) Harris Health representatives and three (3) County representatives, except meetings related to personnel safety. The quorum for any meeting convened to discuss personnel safety will be one (1) Harris Health representative and one (1) County representative. Any action taken by the Joint Operating Committee will require the affirmative vote of a majority of the members in attendance at a duly constituted meeting.

## ARTICLE 6. TERM AND TERMINATION

A. **Term**. The initial term of the Agreement will begin on the Commencement Date and end on the last day of the next County fiscal year, which is September 30, 2022. Thereafter, this Agreement may be extended in writing for three additional one (1) year periods by mutual agreement of both Parties.

B. **Termination**. This Agreement may be terminated as otherwise provided in this Agreement or as follows:

   1. **Termination Without Cause.** Either County or Harris Health may terminate this Agreement without cause by sending written notice to the other Party via certified mail. The effective date of termination will be stated in the notice and shall be at least one year after the date on which notice of termination was sent.

   2. **Termination by Mutual Agreement.** In the event that County or Harris Health agrees in a signed writing, approved by their respective governing bodies, this Agreement may be terminated on the terms and date stipulated therein.

   3. **Annual Appropriations and Funding.** This Agreement is subject to the annual appropriation of funds by the County Commissioners Court. Notwithstanding any provision herein to the contrary, if no funds are appropriated for this Agreement or the funds appropriated are insufficient for Harris Health to continue to provide the same level and quality of Services necessary to satisfy either TCJS or NCCHC standards, then Harris Health will be entitled to terminate this Agreement on a date not less than 180 days after the beginning of the County fiscal year, without penalty or liability to County.

   4. **For Cause.** Either Party may terminate this Agreement for breach hereof upon giving the other Party written notice of said breach and at least 90 days after the date of notice to cure such breach. Written notice of a claim for breach of this Agreement shall be delivered not later than the 180th day after the date of the event giving rise to the claim.

C. **Partial Termination.** Any individual Service provided by Harris Health as stated in Attachment B may be discontinued by the mutual agreement of the Parties in accordance with Section 6.B.2, above, without affecting any other part of this Agreement. For purposes of illustration only, the Parties may mutually agree to discontinue an individual Service or Harris Health may decide to discontinue providing an individual Service on account of insufficient funds appropriation by County.

## ARTICLE 7. DISPUTE RESOLUTION AND PERSONAL LIABILITY

A. **Dispute Resolution.** The Parties agree to submit any dispute to mediation before litigation. Medication will be conducted pursuant to the procedures set forth in Chapter 154 of the Civil Practices and Remedies Code. Venue for such /mediation shall be in Houston, Texas. The Parties further agree that the district courts of Harris County, Texas are the proper forum for any litigation that may be filed subsequent to mediation.

B. **Personal Liability.** The County acknowledges that employees and contractors hired by Harris Health may be deterred from providing Services hereunder if they believe they may be personally liable for their acts or omissions. In recognition of this fact, the County knowingly and voluntarily agrees to release any officer, director, employee, or member of Harris Health's medical staff and any member of an affiliated medical school's faculty or student body from liability for actions or inactions taken in the execution, administration or good-faith performance of this Agreement, it being understand that such persons are entitled to official immunity and shall not be personally liable hereunder.

## ARTICLE 8. MISCELLANEOUS

A. **Assignment.** Harris Health cannot assign this Agreement without the written consent of the County. If the County provides its consent to assignment, Harris Health will be relieved of all responsibility to render Services hereunder, and the County will not pursue any remedies against Harris Health for the breach of this Agreement, including the failure of the assignee to perform any of the obligations stated herein.

B. **Subcontracting.** The County acknowledges that certain physicians, physician assistants, nurse practitioners, and other licensed personnel who will provide Services are not Harris Health employees, and agrees that Harris Health may subcontract for the use of such personnel without obtaining further approvals from the County.

C. **Notice.** Unless otherwise provided herein, all notices required or permitted to be given under this Agreement shall be in writing and shall be deemed given when delivered personally in hand or three (3) business days after sent by certified mail, return receipt requested, postage prepaid, to the correct address of the appropriate Party. The Parties' address for notice is set forth on the first page of this Agreement and may be changed by providing notice to the other Party in compliance with this Section. For purposes of this Agreement, the Sheriff is the primary County contact for notice about Services; however, the Sheriff may designate appropriate persons to serve as the primary contact for particular issues or questions that may arise hereunder.

D. **Governing Law.** This Agreement and the rights and obligations of the Parties hereto shall be governed by, and construed according to, the laws of the State of Texas, except as specifically noted. This paragraph shall not be construed to limit the rights of either Party to intervene in any action arising from this Agreement, wherever pending, in which the other is a Party.

E. **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with its subject matter. All prior negotiations, agreements and understandings with respect to the subject matter of this Agreement are superseded hereby.

F. **Amendment.** No modifications or amendments to this Agreement will be binding upon the Parties hereto unless the same are in writing and signed by the respective Parties.

G. **Waiver of Breach.** The waiver by either Party of a breach of any provision or default of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

H. **Severability.** In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceable provision shall be severed from the Agreement and shall not affect the remainder of the Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

I. **Force Majeure.** Neither Party will be held liable for any delay or failure in performing their obligations hereunder(other than County's obligation to make payment) to the extent that such delay or failure is caused by an unforeseeable event, including fire, flood, or natural disaster, war, strike or labor dispute, labor shortage, government regulation, riots or other forms of civil unrest, actions or decrees of state or federal agencies that make it illegal or impossible for the Party to perform its obligations, or the acts or omissions of carriers (e.g., power and telecommunications) that precipitate outages, or by other similar causes beyond their control. For avoidance of doubt, labor shortages due to COVID-19 and recent government orders compelling vaccinations for COVID-19 will be treated as a force majeure event.

J. **Non-Discrimination; Affirmative Action.** Harris Health is an Equal Opportunity employer. In the administration of its employment policies and practices, Harris Health does not discriminate against employees or applicants for employment because of race, color, national origin, sex, sexual orientation, religion, age, veteran status, or disability.

K. **Workers Compensation.** Harris Health will provide worker's compensation coverage to its employees to the extent required by and pursuant to those Texas laws dealing with state employees injured during employment.

L. **Tort Claims Act.** The Parties represent that the Parties are entering into this Agreement for the purpose of performing governmental functions, as such term is defined by the Texas Tort Claims Act. Therefore, every act or omission of either Party, which in any way pertains to or arises out of this Agreement, falls within the definition of governmental function. No provision of this Agreement that imposes a legally impermissible obligation or restriction on a Party will be enforceable. The Parties reserve, and do not waive, their respective rights of governmental immunity and similar rights and do not waive their rights under the Texas Tort Claims Act. Neither Party waives, nor shall be deemed hereby to waive, any immunity or defense that would otherwise be available to it against claims arising in the exercise of its powers or functions or pursuant to the Texas Tort Claims Act or other applicable statutes, laws, rules, or regulations.

M. **Independent Contractor Status.** The Parties acknowledge that Harris Health is an independent contractor. Nothing in this Agreement is intended to nor shall it be construed to create an agency relationship, an employer/employee relationship, or a joint venture relationship among the Parties.

[Signature blocks on next page]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement in their official capacities with legal authority to do so.

**HARRIS COUNTY HOSPITAL DISTRICT D/B/A HARRIS HEALTH SYSTEM**

**HARRIS COUNTY**

By:_____

**DR. ESMAEIL PORSA**
**President and CEO**

_____2/3/2022_____
**Date**

By:_____

**LINA HIDALGO**
**County Judge**

_____February 8, 2022_____
**Date**

**APPROVED AS TO FORM:**
**CHRISTIAN D. MENEFEE**
**Harris County Attorney**

By: *Holly Gummert*_____
Holly Gummert
Assistant County Attorney
C.A. File No. 21hsp0080

**APPROVED AS TO FORM:**
**CHRISTIAN D. MENEFEE**
**Harris County Attorney**

By: *Philip Berzins*_____
Philip Berzins
Assistant County Attorney
C.A. File No. 21GEN3102

**ATTACHMENT A-1**

HEALTH SERVICES PLAN

---

### I.    Purpose

The purpose of this Plan is to govern the health services provided to inmates incarcerated in the Harris County Jail system.  The following Plan is designed to meet all applicable criteria of the Minimum Jail Standards manual, Chapter 273.14

*CHAPTER 273*

*1.  Health Services. The owner/operator of each facility shall provide medical, mental, and dental services in accordance with the approved health services plan. These services may include, but shall not be limited to, the services of a licensed physician, professional and allied health personnel, hospital, or similar service.*

*2.  Health Services Plan. Each facility shall have and implement a written plan, approved by the Commission, for inmate medical, mental, and dental services. The plan shall:*

*(1) provide procedures for regularly scheduled sick calls;*

*(2) provide procedures for referral for medical, mental, and dental services;*

*(3) provide procedures for efficient and prompt care for acute and emergency situations;*

*(4) provide procedures for long-term, convalescent, and care necessary for disabled inmates;*

*(5) Provide procedures for medical, mental, nutritional requirements, special housing and appropriate work assignments and the documented use of restraints during labor, delivery and recovery for known pregnant inmates.*

*(6) provide procedures for the control, distribution, secured storage, inventory, and disposal of prescriptions, syringes, needles, and hazardous waste containers;*

*(7) provide procedures for the distribution of prescriptions in accordance with written instructions from a physician by an appropriate person designated by the sheriff/operator.*

*(8) provide procedures for the control, distribution, and secured storage of over-the-counter medications;*

*(9) provide procedures for the rights of inmates to refuse health care in accordance with informed consent standards for certain treatments and procedures (in the case of minors, the informed consent of a parent, guardian, or legal custodian, when required, shall be sufficient);*

*(10)    provide procedures for all examinations, treatments, and other procedures to be performed in a reasonable and dignified manner and place;*

*(11)    provide that adequate first aid equipment and patient evacuation equipment be on hand at all times.*

*3.Health Instructions. All medical instructions of designated physicians shall be followed.*

*4.Health Records.*

*(a) The health services plan shall include procedures for the maintenance of a separate health record on each inmate. The record shall include a health screening procedure*

*administered by health personnel or by a trained booking officer upon the admission of the inmate to the facility and shall cover, but shall not be limited to, the following items:*

*(1) health history;*

*(2) current illnesses (prescriptions, special diets, and therapy);*

*(3) known pregnancy*

*(4) current medical, mental, and dental care and treatment;*

*(5) behavioral observation, including state of consciousness and mental status;*

*(6) inventory of body deformities, ease of movement, markings, condition of body orifices, and presence of lice and vermin.*

*(b)　Separate health records shall reflect all subsequent findings, diagnoses, treatment, disposition, special housing assignments, medical isolation, distribution of medications, and the name of any institution to which the inmate's health record has been released.*

*(c)　The Texas Uniform Health Status Update form, in the format prescribed by the Commission, shall be completed and forwarded to the receiving criminal justice facility at the time an inmate is transferred.*

*(d)　Each facility shall report to the Texas Department of Health (TDH) the release of an inmate who is receiving treatment for tuberculosis in accordance with TDH Guidelines.*

**II.**　Sick Call And Referral For Services:

A. Requesting Medical Attention:

1. Sick call request slips shall be available upon request and accessible in all cell housing areas.

2. If the supply of sick call requests is depleted in the living area, the security staff operating the floor control center shall obtain more request forms by notifying the Administrative Lieutenant and requesting replacement.

3. Routing:

   a. Inmate requests for health care services (medical, dental and psychiatric) are indicated on the sick call request slip.

   b. Completed sick call requests are placed in the 'medical' boxes located in each cellblock or handed directly to the nurse during medication administration, then delivered to the Health Services Division daily.

4. Sick call requests will be reviewed daily for urgent problems. Any inmate needing immediate care will be brought to the clinic.

5. Remaining sick call requests will be triaged by a nurse and the inmate seen as medically indicated.

6. All sick call requests will be acted upon within 48 hours of the day in which they were received. Sick call scheduling will be reviewed by the Director of Nursing to ensure timely care is being delivered.

7. During emergency lockdown, a modified sick call will be conducted at the cell doors. The Medical Director or his/her designee will be responsible for determining the level of care to be rendered during modified sick call.

8. The medical clinic will accommodate emergency walk-ins with conditions that require immediate attention (e.g. acute illness, injuries, lacerations, etc.).

B. Sick Call:

1. Defined:

   a. Sick call is care for ambulatory inmates with health care requests that are evaluated and treated in an outpatient clinic setting. It is a system where each inmate reports for and receives appropriate medical services for non-emergency illness or injury.

   b. Sick call is conducted by a physician and/or other qualified health care provider in an outpatient clinic setting.

C. Sick Call Procedures for Inmates Unable to Write:

1. Any inmates desiring medical treatment may seek help in the following manner:

   a. Report to a deputy and explain that he is unable to read or write English or Spanish and needs assistance.

   b. The Deputy will obtain a sick call request slip and fill out the following sections:

      *i.* Inmate's name

      *ii.* SPN number

      *iii.* Cell assignment

      *iv.* Write "HELP" on the form in the "Reason" area. For confidentiality reasons, security will not ask the inmate the nature of his/her complaint.

   c. The deputy will sign the form.

   d. The deputy will place the form in the designated box for pick up by the Health Services Division representative.

   e. Medical personnel, upon receiving the request slip, will call the inmate to the clinic, interview him/her and make proper disposition.

2. Interpretation by a deputy will not erode, erase or reduce the patient/physician confidentiality.

   a. Medical information obtained through an interpretation (deputy or civilian) will be considered as if direct from patient to physician; and,

   b. All applicable state laws will remain in force.

D. Sick Call Procedures for Inmates in Administrative Separation

1. All inmates assigned to Administrative Separation will be seen by a qualified health care provider at least three times per week.

**III.** Emergency Situations:

A. Care for an acute illness or an unexpected health need that cannot be deferred until the next scheduled clinic is considered an emergency and shall be handled as such either within the medical facility or through transfer to a hospital emergency room when deemed necessary by qualified health care staff.

B. Emergency transfer of a patient to a Harris Health System will be upon verbal/written orders of the responsible physician. The physician or qualified health care provider in coordination with the Watch Commander will determine the mode of transportation.

C. All members of the staff (health care and security) must be familiar with the procedures for obtaining emergency medical care. D. Transfer to the Emergency Room.

1. All patients transferred to a hospital emergency room will be recorded in the daily Emergency Log/Record noting the patient's: a. full name;

   a. SPN number;

   b. Housing assignment;

   c. Date and time of transfer;

   d. The nature of the problem or reason for transfer; and,

   e. The mode of transportation

2. Upon return from the emergency room, the log will be updated with the documentation of care.

3. The patient will be evaluated by the physician on duty upon return from the Emergency Room.

E. The physician on duty will review all recommendations, medication, etc. and commence with the appropriate treatment plans. If additional care is not recommended, the physician will note in the chart his/her review along with the date and time of follow up.

F. Patients will not be housed in the Infirmary cellblocks unless so ordered by a physician.

G. First Aid kits and Automated External Defibrillators are located on each floor within the jail housing units.

IV. Long-Term, Convalescent and Disabled Care:

A. Definition: Skilled nursing care or infirmary care is defined as:

1. inpatient bed care;

2. by, or under the supervision of, a registered nurse;

3. for an illness or diagnosis that requires limited observation for management; and

4. does not require admission to a licensed hospital B. Medical Infirmary:

5. Admission and discharge are by physician order only.

6. The infirmary meets the following criteria:

   a. A physician is available (on call) 24 hours a day.

   b. Nursing services are under the direction of a full-time, registered nurse.

   c. Qualified health care personnel are on duty 24 hours a day.

      d. Specific nursing care procedures are dictated by a manual of nursing care that is updated at least annually and is consistent with the Texas Nurse Practice Act.

      e. Patients are within sight or sound of a health care staff member at all times.

7. Infirmary rounds are made by the physician on a frequency as deemed clinically appropriate for each patient.

8. A patient who is acutely ill, or when the charge nurse requests the patient to be seen sooner than the routine rounds will be referred to the clinic immediately.

**V.** Management of Pregnant Detainees

    A. Incoming detainees will undergo routine medical/mental health intake screening which includes questioning for pregnancy.

1. Affirmative answers result in diversion of the detainee to the medical clinic prior to classification and housing

2. Urine pregnancy testing is performed on each female detainee referred to the clinic and result is documented in the medical record.

3. Each detainee will be evaluated by a provider and assessed for medical and mental health needs and special housing.

      a. Special housing needs are documented through infirmary admission orders or Special Needs Advisement forms.

      b. Prenatal vitamins and/or other medications are prescribed by the provider in his/her clinical judgment.

      c. Pregnant detainees are referred to the on-site HCSO Women's Clinic for specialist evaluation and follow-up.

4. All female detainees are additionally screened for pregnancy with urine pregnancy tests at the 14-Day Health Assessment

5. Pregnant detainees will be screened for nutrition risk by the Dietary Department within 30 days of booking.

6. The Inmate Classification Section will determine appropriate work assignments for known pregnant detainees.

7. A magistrate will be notified in writing or by electronic notice within 72 hours if a pregnant inmate is suspected to have mental illness or mental retardation.

8. Documentation of use of restraints during labor, delivery and recovery for known pregnant inmates shall include, but not be limited to the following: the events leading up to the need for restraints, the time the restraints were applied, the justification for their use, observations of the inmate's behavior and condition and the time the restraints were removed.

**VI.** Control, Distribution, Secured Storage, Inventory and Disposal of Prescriptions, Syringes, Needles and Hazardous Waste Containers:

    A. The Medical Director, Director of Nursing, Medical Administrator, and area managers will determine the types of equipment, supplies, materials and publications required for the delivery of health care, as well as their adequacy.

B. Inventory lists will be maintained on all supplies including those items subject to abuse, i.e., syringes, needles, and sharp instruments.

C. Procedure:

1. Continuous inventory logs will be maintained for instruments and supplies that pose a security risk, i.e., syringes, needles, scissors, etc.; and a log maintained documenting same.

2. Transportation and emergency equipment will be inspected daily to ensure safety of operation. Dysfunctional equipment will be immediately removed from service, and the Medical Administrator notified in writing of repairs needed.

3. Reference materials will be maintained at each Health Services Division facility's clinics where they will be accessible 24 hours per day.

4. First aid supplies and equipment and patient evacuation equipment will be maintained at all times.

5. Inventory records, maintenance and procurement for the Health Services Division will be under the direction of the Medical Administrator.

6. Detainees shall be prohibited from accessing medical and pharmaceutical storage areas unless accompanied by supervisory personnel.

D. Disposal:

1. Definition – Hazardous Waste:

   a. Waste, in solid or liquid form, from patient rooms (including isolation), clinic areas and/or laboratory; and,

   b. Used needles, used dressings, disposable suction cannulas; and/or,

   c. A combination of the above.

2. All waste from patient isolation rooms shall be:

   a. Red-bagged;

   b. Placed in special boxes, and,

   c. Taken for incineration.

3. All infective waste from the clinic areas shall be

   a. Red-bagged;

   b. Placed in special boxes, and,

   c. Taken for incineration.

4. All waste from the laboratory/pharmacy shall be:

   a. Red-bagged;

   b. Placed in special boxes, and,

   c. Taken for incineration.

5. All used needles shall be:

   a. Placed in labeled, impervious needle containers;

    b.  Sealed; and,

    c.  Taken for incineration.

6. All infective waste shall be placed in a locked storage area.

7. All containers as described above shall be labeled with "BIOHAZARD" sign(s).

8. All hazardous (biohazard) waste is disposed of by an outside service.

**VII.** Distribution of Prescriptions and Medications:

  A. Dispensing Pharmaceuticals:

    1. Definition: "Dispense" means:

      a.  Preparing, packaging, compounding or labeling for delivery a prescription drug or device;

      b.  In the course of professional practice;

      c.  To an ultimate user or his agent;

      d.  By or pursuant to the lawful order of a practitioner; and,

      e.  A person may not dispense prescription drugs unless (s)he is a licensed pharmacist.

    2. All prescription drugs shall be dispensed:

      a.  By a licensed pharmacist;

      b.  Pursuant to a prescription drug order, i.e., a written or verbal order from a practitioner or his authorized agent;

      c.  To a pharmacist;

      d.  For a drug or device to be dispensed.

  B. Administration of Drugs Only Upon Order of Authorized Practitioner:

    1. Drugs will be administered only upon a prescription drug order from:

      a.  Harris County Sheriff's Office physician/dentists; or

      b.  The Harris Center providers.

  C. Daily Medication rounds:

    1. Medication prescribed by a medical or mental health provider will be administered as ordered by a licensed nurse.

    2. Procedure:

      a.  Wash hands before handling medication.

      b.  Medication cart will be transported to each floor.

      c.  Notify security personnel that nurse is prepared to administer prescription medication.

      d.  Security personnel will escort the medication nurse at all times.

      e.  Any disruption in the cellblock during medication administration should be referred to security personnel for disposition.

    f.  Identify patient carefully, using all precautions.

       *i.*  Look at ID band and call patient by name, or ask patient to state their name.

       *ii.*  Medication cannot be administered to persons without ID bracelets.

       *iii.*  Notify classification personnel, via a prescribed manner, that patient is without ID band, routing a copy to the Director of Nursing.

    g.  If more than one prescription is to be given at one time, administer each one separately after the previous medication has been swallowed.

    h.  Remain with patient until each medication is swallowed, then have patient open mouth to visually verify ingestion. Unless nurse has seen patient swallow medication, it cannot be recorded that the medication was administered.

    i.  Immediately record medications, given, refused, omitted or wasted on the patient's Medication Administration Record. Circle your initials for any dose not given, and report reason.

D. Restricted Medications:

1. Restricted Over-the Counter medications shall be distributed to patients by medical personnel (nursing and provider); and,

2. Restricted Over-the-Counter medications shall be stored and issued by pharmacy personnel as needed;

E. Over-the-Counter Medications:

1. Other Over-the-Counter medications, including those distributed by nursing personnel, shall be stored in the medical supply storage area; and

2. The distribution of the supplies is under the control of designated personnel.

F. Medications for Self Administration:

1. All medication for self administration shall be filled as outpatient prescriptions by the pharmacy and issued to the patient to be kept on his or her person (KOP).

2. Medications for self administration must be listed as such in the formulary and approved by the Medical Director.

3. Orders for medication for self administration shall be written on a prescription blank in addition to the medical record.

4. The prescription shall be assigned a unique prescription number and filled according to the laws and rules governing the dispensing of outpatient prescriptions.

5. With the exception of Nitroglycerin Sublingual tablets, no prescription containers for self administration medications shall be dispensed in glass containers.

6. KOP medications are written for a maximum for 30 days except for those selected medications approved for 365-day distribution.

7. Inmates must keep medications in the original containers with the label attached. Mixing medications is not allowed.

8. Thirty days beyond the expiration date on the medication label, the medication becomes contraband.

9. All medications confiscated by security will be brought to the medical clinic to be examined by the nurse on duty. (S)he will document in the medical record why a particular inmate's medications were confiscated and by whom.

10. Inmates are allowed to keep their current KOP medications when transferred from one facility to another.

**VII.** Refusal of Treatment

    A. Purpose: The purpose of this section is to designate the patient's right:

        1. to refuse treatment;

        2. to refuse treatment at a hospital or clinic for further treatment; and/or,

        3. to refuse consultation by

            a. Harris County Sheriff's Office Health Services personnel;

            b. The Harris Center providers; or,

            c. By Harris Health System hospitals or clinics.

    B. Procedure:

        1. The qualified health care provider will inform the patient of the medical consequences of his/her actions then note that the patient was counseled in the medical record.

        2. The patient shall sign the Refusal of Treatment form in the presence of at least one qualified health care provider who will then sign his/her name to the form.

        3. If the patient refuses to sign the form, "refused to sign" is written on the form; and the witness shall sign.

        4. The patient retains the right to request additional medical treatment at any time, according to established policies and procedures.

**IX.** Procedures For Examination And Treatment:

    A. Inmates who present for evaluation and treatment of medical complaints shall be accorded respect by Health Services Division personnel.

    B. Shall be performed in a reasonable and dignified manner and place.

    C. Physical examinations will be performed privately.

    D. A chaperon is required for breast/genital exams.

    E. Patients will be informed of treatment plans and given the opportunity to ask questions of the treating personnel.

    F. Procedure:

        1. All patient evaluations are conducted in cubicles with curtains drawn during physical examinations.

        2. Written consent is obtained prior to invasive procedures.

        3. Verbal consent is obtained prior to genital or rectal examinations.

**X.** Health Records:

A. Format of the Medical Record:

   1. A medical record shall:

     a.  Be generated on all inmates admitted to the Harris County Sheriff's; and,

     b.  be maintained in an orderly manner.

B. Procedure:

   1.  A medical record will be established on every patient seen by a physician or other health care provider.

   2.  If the patient is seen by either a nurse, nurse practitioner, physician's assistant, or a physician, the medical record will contain, at a minimum, the following documents:

     a.  Problem list

     b.  Intake screening form; containing questions related to:

       i.    Health history

       ii.   Current illnesses

       iii.  Known pregnancy

       iv.  Current medical, mental and dental care

       v.    Behavioral observation

       vi.  Inventory of body deformities

       vii.  Presence of lice or skin infections

     c.  Clinic record

     d.  Nursing triage clinic record

     e.  Other supporting documents if they exist, i.e., lab, radiology, MAR's, etc.

     f.  The above information will be located in the electronic medical record in reverse chronological order.

   3.  The medical record of a patient who has been incarcerated long enough to receive a physical assessment and has not received any other medical, dental, or psychiatric care will contain the intake screening form.

   4.  All medical records will be electronic; archived records are kept in terminal digit file.

     a.  There are 100 primary sections ranging from 00 to 99 in terminal digit.

     b.  Within each terminal digit section:

       i.    The records are arranged by secondary digit (middle two digits of the patient's SPN);

       ii.   Followed by tertiary digit (first two or three digits).

C. Confidentiality/Access to Medical Records:

   1.  The Medical Records Section of the Harris County Sheriff's Office maintains paper and electronic medical records on each inmate/patient consistent with applicable laws.

2. Record Maintenance:

   a. The patient has the right to expect that all communications and records pertaining to his/her care will be treated as confidential. Written authorization by the inmate/patient is required for the release of medical information outside of the correctional system.

   b. Patient medical records are maintained separate and apart from his/her confinement records.

   c. The Records Manager is considered the custodian of the medical records.

3. Release of Medical Information

   a. Only medical records of care provided by the Harris County Sheriff's Office, Health Services Division, may be released to the patient or their agents.

   b. The Medical Records staff will be responsible for copying the medical record.

   c. No medical information shall be released to a patient or to a patient's family member while incarcerated at the Harris County Jail if it is determined that doing so would jeopardize the health, safety, security, custody, or rehabilitation of the patient or other patients, or the safety of any officer, employee or other person at the correctional institution or responsible for transporting the inmate. If a patient requests inspection of his/her protected health information the request must be granted unless one of the other grounds for denial applies under the regulations.

   d. The Texas Uniform Health Status Update form will be completed and forwarded to a receiving criminal justice facility at the time a patient is transferred.

   e. Appropriate TB information will be provided to public health authorities upon the release of a patient who is receiving treatment for tuberculosis in accordance with Texas Department of State Health Services guidelines.

4. Access to Medical Records

Only those persons designated below have authorized access to the medical records without patient consent/authorization:

   a. Health Services Division personnel involved in the treatment of the patient.

   b. Outside physician or health care facility in emergency situations

   c. The Board of Pardons and Texas State Parole Officials

   d. Legal counsel of the Harris County Sheriff's Office

   e. Court Order/Subpoena requests

   f. Medical Examiner/Coroner

   g. Quality Improvement

   h. The Medical Director or Medical Administrator may release to the Detention Bureau approved personal information contained in the medical record, if necessary, for housing and/or other special needs of the patient.

**XI.** Revision:

This Plan has been revised and/or updated on the below listed dates:

Approved:

February 05, 2008
December 07, 2009
September 23, 2011

February 01, 2013
June 26, 2017

# TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

January 3, 2018

Dear Sheriff and Jail Administrator:

As you know, SB1849 required the Texas Commission on Jail Standards to adopt a minimum standard regarding the continuity of prescription medications. Information regarding this new requirement was previously provided to you in a TA Memo and was published for comment in the Texas Register. This new rule was adopted by the board and became effective January 1, 2018.

In order to ensure all counties incorporate this requirement into their existing Health Services Plan, we request that you sign the attached addendum and return it to the Commission by February 1, 2018. We will attach it to your approved plan. This will demonstrate that you have amended your plan, and that it complies with the requirements of SB1849.

Send in ONLY the addendum. If you submit the entire Health Services Plan, it will be returned without approval. This is necessary due to the fact that if the entire plan is submitted, it has to be reviewed in its entirety to ensure that no other changes have been made. It is our goal to ensure that all counties have updated their Health Services Plan as quickly as possible. If 240 counties/facilities were to submit their entire Health Services Plan for review, it would take at least 3 months to review them all and we would not be able ensure counties are complying with the new law.

If you have any questions regarding the submission of the addendum, please contact Tomas Torres at (512) 463-3236 or tomas.torres@tcjs.state.tx.us.

For those of you that picked up on that, Ms. Luz Lozano retired at the end of the year after 26 years of service with the agency. We are going to miss her greatly as she was without equal when it came to Operational Plans and reviewing them.

Sincerely,

Brandon S. Wood
Executive Director

Judge Bill Stoudt, Longview, Chair | Sheriff Dennis D. Wilson, Groesbeck | Commissioner Ben Perry, Waco
Jerry W. Lowry, New Caney, Vice Chair | Sheriff Kelly Rowe, Lubbock | Duane Lock, Southlake
Larry S. May, Sweetwater | Dr. Esmaeil Porsa, M.D., Parker | Melinda E. Taylor, Austin

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

_____ County

## HEALTH SERVICES PLAN ADDENDUM
## CONTINUITY OF PRESCRIPTION MEDICATION

The following addendum to the _**HARRIS**_ County Health Services Plan is effective January 1, 2018:

A qualified medical professional shall review as soon as possible any prescription medications an inmate is taking when the inmate is taken into custody. In this context, qualified medical professionals include but are not limited to physicians, Registered Nurses (RN), and Licensed Vocational Nurses (LVN) performing their duties within the scope of their license. For this purpose, pharmacists and Emergency Medical Technicians (EMT) are not qualified medical professionals.

_____       _1- 9-18_
Sheriff's signature              Date

_____       _9 JAN 2018_
Jail Administrator's signature   Date

**ATTACHMENT A-2**
**MENTAL DISABILITIES/SUICIDE PREVENTION PLAN**

I.  Inmates With Mental Disabilities / Inmate Suicide Prevention Plan

   A.  The following Plan is designed to meet all applicable criteria of the Minimum Jails Standards manual, Chapter 273.5: Health Services ~ Mental Disabilities / Suicide Prevention Plan.

   *273.5 Mental Disabilities / Suicide Prevention Plan.*

   *(a) Each sheriff/operator shall develop and implement a mental disabilities/suicide   prevention plan, in coordination with available medical and mental health officials, approved by the Commission by March 31, 1997. The plan shall address the following principles and procedures:*

   *(1)     Training. Provisions for staff training (including frequency and duration) on the procedures for recognition, supervision, documentation, and handling of inmates who are mentally disabled and/or potentially suicidal. Supplemental training should be provided to those staff members responsible for intake screening;*

   *(2)     Identification. Procedures for intake screening to identify inmates who are mentally disabled and/or potentially suicidal and procedures for referrals to available mental health officials;*

   *(3)     Communication. Procedures for communication of information relating to inmates who are mentally disabled and/or potentially suicidal;*

   *(4)     Housing. Procedures for the assignment of inmates who are mentally disabled and/or potentially suicidal to appropriate housing;*

   *(5)     Supervision. Provisions for adequate supervision of inmates who are mentally disabled and/or potentially suicidal and procedures for documenting supervision;*

   *(6)     Intervention and Emergency Treatment. Procedures for staff intervention prior to the occurrence of a suicide and during the progress of a suicide attempt, or serious deterioration of mental condition;*

   *(7)     Reporting. Procedures for reporting of completed suicides to appropriate outside authorities and family members; and*

   *(8)     Follow-Up Review. Procedures for follow-up review of policies by the sheriff/operator and mental health and medical officials following all attempted or completed suicides.*

   *(b) Screening Instrument. An approved mental disabilities/suicide prevention screening instrument shall be completed immediately on all inmates admitted.*

   *(c) Mental History Check. Each jail shall:*

   *(1)     check each offender upon intake into the jail against the Department of State Health Services Continuity of Query (CCQ)system to determine if the offender has previously received state mental healthcare;*

   *(2)     record whether the CCQ system was checked on the initial intake screening form; and*

      *(3)     include any relevant mental health information on the mental health screening instrument and, if sentenced to the Department of Criminal Justice, on the Uniform Health Status update form.*

B.  The Harris County Sheriff's Office shall strive to identify and manage all mentally disabled and/or potentially suicidal inmates in the Sheriff's custody with acceptable medical practices and sound management principles.

**II.**    Procedure:

A.  Mental Disabilities / Suicide Prevention Training:

1.  The Jail Administrator or designated division shall develop and implement a training program designed to recognize inmates who are mentally disabled and/or potentially suicidal.

2.  Appropriate persons assigned to the Classification Section, Booking and Release Section and the Health Services Bureau should receive a minimum of two (2) hours training annually in suicide prevention.

3.  Basic County Corrections Course (Jail school) instructors will include a section on the recognition of inmates with mental disabilities and suicide prevention.

4.  Training shall include (but not be limited to):

    a.  Recognition of inmates with mental disabilities.

    b.  Recognition of potentially suicidal inmates.

    c.  Supervision of inmates with mental disabilities and/or potentially suicidal inmates within the cellblocks.

    d.  Documentation of potentially suicidal inmates or inmates with mental disabilities.

    e.  Handling of inmates with mental disorders who may or may not be potentially suicidal.

    f.  Intervention of an attempted suicide may be made by any staff member.

B.  Documentation:

1.  Any Staff member observing behavior indicative of a mental health issue shall document same and forward the report to his/her immediate supervisor for review and dissemination.

2.  When an inmate experiences a reported mental health crisis, documentation shall be maintained in the inmate's medical file.

C. Screening, Identification, and Referral:

   1. All inmates coming into the Sheriff's custody shall receive a health screening by appropriately licensed personnel.

      a. The screening form shall contain questions which specifically ascertain suicidal tendencies and/or depression.

      b. Classification deputies shall also ask inmates for information concerning suicidal tendencies and/or depression.

   2.    Other sources used to identify possibly suicidal inmates:

      a. Staff Member Observation

      b. Medical History

      c. Mental Health History

      d. Classification Personnel

      e. Health care providers

      f. Previous Jail Records

         g. Family

   3. Referral to mental health professionals may be routinely accomplished by nurses, chaplains, or other staff members; or, by self-referral via "Inmate
Request Form."

      a. Referrals may also be made by outside sources.

      b. Mental Health personnel shall screen all referrals.

         c. A magistrate shall be notified, in writing or by electronic notice, within 12 hours if an inmate is suspected to have mental illness or Intellectual and Developmental Disability (IDD).

D. Communications:

Information regarding an inmate exhibiting a mental health crisis and/or potentially suicidal behavior shall be forwarded to the Health Services Section in a timely fashion.

Pertinent information regarding incidents that have occurred during a shift or requiring special attention should be passed on to oncoming shift by either verbal or written means.

E. Initial Documentation:

Initial documentation by deputies and/or detention officers will be done on each occurrence of a mental health crisis and referred to the Health Services Bureau as required.

F. Housing:

1. Suicidal inmates should generally be housed in cellblocks under the direction of mental health professionals.

2. If necessary, an inmate experiencing a mental health crisis, which threatens the physical wellbeing of any person may be placed in a separation cell.

G. Supervision and Documentation:

1. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined.

2. All inmates, either classified or temporarily housed in any separation cell, shall have detailed records kept of their daily activities.

H. Intervention:

1. Jail personnel have been trained to respond to the location of an attempted suicide and take immediate action to remove any items which might be used to facilitate the suicide.

2. In concert with the removal of the threat, steps shall be taken to provide immediate medical aid to the victim.

   a. All control centers shall have first aid kits.

   b. All Housing floors are to be equipped with AED's.

I. Reporting Procedure:

1. Attempted Suicides:

   a. Medical personnel shall treat any injuries sustained in an attempted suicide.

     b. A thorough, accurate and detailed report shall be initiated by the floor deputy and forwarded to:

        *i.* Classification,

        *ii.* Health Services Section,

        *iii.* Watch Commander.

2. Suicides resulting in death:

     a. Only Medical personnel will determine and/or pronounce the death of the inmate.

     b. The Watch Commander shall ensure::

        *i.* An appropriate crime scene is established and secured;

        *ii.* A deputy is assigned to complete a criminal offense report;

        *iii.* Proper investigative protocol are followed;

        *iv.* The chaplain's office is notified and requested to contact the deceased inmate's next-of-kin.

     c. Subsequently, a report of "Death in Custody" will be prepared and forwarded to:

        *i.* The Attorney General's Office within thirty (30) days.

        *ii.* The Texas Commission on Jail Standards within 24 hours.

        *iii.* Upon conclusion of an investigation by the Sheriff or any other designated law enforcement agency, copies of the Custodial Death Report, Autopsy Report and any information requested by the Commission shall be forwarded to the Texas Commission on Jail Standards.

3. Follow-up Review:

     After a suicide or suicide attempt, a follow-up critique shall be completed to ensure:

     a. All required reports are prepared and filed.

     b. Policies and procedures are updated if needed; and,

     c. All staff members are properly referred to Harris County Risk Management for follow-up counseling and treatment as appropriate.

     d. Inmates requesting counseling services shall be referred to the local mental health authority (LMHA).

J. Mental History Check

The Harris County Sheriff's Office will:

1. Check each offender against the Department of State Health Services Continuity of Care (CCQ) System to determine if the offender has previously received state mental health care.

2. Record whether the CCQ system was checked on the initial intake screening form; and

3. Include any relevant mental health information on the mental health screening instrument and, if sentenced to the Department of Criminal Justice, on the Uniform Health Status update form.

**III.**   Revision:

This Plan has been revised and/or updated on the below listed dates:

Approved:  February 2008
Approved: September 23, 2011
Approved: July 21, 2017
**Approved: November 19, 2019**

**ATTACHMENT B-1**
**EVALUATION UPON INTAKE AND ASSESSMENT OF DETAINEES**

**Medical Evaluation at Intake.** Harris Health will ensure that a qualified medical professional (i.e., registered nurse or higher level practitioner) is available to perform an evaluation of any potential detainee that the Sheriff refers for the purpose of identifying any medical issues that would prevent the Sheriff from taking the potential detainee into custody (e.g., emergency medical condition) or would require placing the detainee in special medical housing units; such evaluation will be performed in accordance with 37 Tex. Admin. Code § 273.4(a) and the Jail Health Services Plan, attached to the Agreement as Attachment A-1. For avoidance of doubt, this screening will include a pregnancy screening for all female detainees, regardless of age, and a tuberculosis screening. Each evaluation will be documented in the appropriate medical record associated with the detainee. Moreover, if the potential detainee requires emergency medical care, Harris Health will determine whether to contact the Houston Fire Department (HFD). Whenever HFD transport is initiated, Harris Health will prepare and provide the paramedic with an information sheet that describes the medical condition of the potential detainee.

**Review of Prescription Medications.** Harris Health will review any prescription medication a detainee is taking at the time the detainee is taken into custody as soon as possible and, in no event, later than forty-eight (48) hours.

**Fourteen-Day Comprehensive Health Assessment.** Harris Health will perform a comprehensive health assessment on each detainee within fourteen (14) days of his/her arrival in accordance with Attachment A-1.

**Screening Prior to Detainee Transfers.** Harris Health will conduct another medical screening on any detainee to be transferred from a Detention Facility to the Texas Department of Criminal Justice or other criminal justice facilities. Such screening will be performed by qualified medical professionals and be result in the identification of acute or chronic conditions, communicable diseases, and current medications on the Texas Uniform Health Status Update form. This form will accompany the detainee upon transfer. Harris Health will coordinate with the Mental Health Provider to perform the mental health evaluation component of the intake screening.

**ATTACHMENT B-2: SICK CALL**

Harris Health will ensure that medical professionals regularly schedule a time, each day, to evaluate and address the non-emergent health care needs of detainees (such time, "Sick Call"). Harris Health will triage oral and written requests for Sick Call within twenty-four (24) hours of receipt by a medical professional, and, when the request describes a clinical symptom, the detainee will be scheduled to be seen by a medical professional within forty-eight (48) hours unless on the weekend. Generally, a registered nurse will evaluate each detainee utilizing established nursing protocols and will treat and release the detainee, unless the detainee requires an appointment with a higher level practitioner (e.g., midlevel practitioner or physician). When a higher level practitioner's advice is needed, the registered nurse will schedule the detainee for the next available appointment with the practitioner.

All detainee requests for Sick Call will be documented and included in the Monthly Statistical Report.

**ATTACHMENT B-3: DENTAL CARE**

Harris Health will employ dentists and dental assistants to provide emergency and certain palliative dental care services that are designed to relieve pain, eliminate infection and disease, and restore the function of teeth. Harris Health will also perform an annual examination that includes:

5. visual observation of oral hard and soft tissues, placement and status of the teeth, and coloration, and position of the tongue and uvula;
6. review of the detainee's medical history and current complaints; and
7. extraoral head and neck examination.

The annual dental examination will result in the culmination of a treatment plan that includes appropriate follow up care. All dental care provided will be in accordance with NCCHC standards.

**ATTACHMENT B-4: MENTAL HEALTH SERVICES**

Harris Health will oversee the administration of mental health services provided by the local mental health authority (herein, the "Mental Health Provider") pursuant to a contract between the County and the Mental Health Provider. Specifically, Harris Health will supervise the performance of the Mental Health Provider in accordance with Texas Government Code Chapter 791 and advise the County as to whether the Mental Health Provider:

1. is satisfying NCCHC standards on Basic Mental Health Services and any quality metrics established for the mental health services;
2. has allocated sufficient resources to ensure that mental health screenings are timely completed and that a mental health professional is available at the jail or through a tele-mental health service 24 hours a day;
3. is engaging in planning, policy development, and coordination with Harris Health on services required by the Sheriff;
4. has developed discharge plans for detainees that incorporate jail diversion strategies for adults with schizophrenia, bipolar disorder, post-traumatic stress disorder,  schizoaffective disorder,  anxiety disorder, or delusional disorder; and
5. should be replaced with another mental health provider.

Harris Health will give the Mental Health Provider access to the Sheriff's EMR system and, if designated by the detainee as their chosen pharmacy, provide appropriate and necessary mental health medications. Notwithstanding the foregoing, Harris Health is not responsible for providing mental health services to detainees, unless otherwise required by the Texas Constitution or the district's enabling statute.

Harris Health will also participate in any advisory committee the Board of Trustees for the Mental Health Provider establishes under Health & Safety Code Section 534.012 related to jail services or, at the Sheriff's request, as an ex-officio nonvoting member of the Mental Health Provider's Board of Trustees.

**ATTACHMENT B-5: LABORATORY AND RADIOLOGY SERVICES**

**Laboratory Services.** Phlebotomy services will be provided on-site, with specimens to be processed at the Detention Facility, in Ben Taub's laboratory, or by a third party. If Harris Health utilizes a third party to process specimens, it will coordinate with and pay such third party for all laboratory services performed. Indications of pathology will result in scheduling of a follow-up appointment with the detainee who was the subject of the test. Routine results will be communicated to detainees within 3-5 days of receipt from the laboratory.

**Radiology Services.** Harris Health will employ radiology technologists to perform diagnostic examinations at the Detention Facility. The technologist will be responsible for calibration and maintenance of all equipment.

**ATTACHMENT B-6: EMERGENCY CARE AND GROUND AMBULANCE TRANSPORT**

**Emergency Care.** Harris Health will ensure medical professionals are available 24 hours per day, 7 days per week, 365 days per year to render emergency care that is focused on stabilizing a detainee, including CPR and first aid, at the Detention Facility. For purposes of this Attachment, "emergency medical care" means bona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in: (i) placing the detainee's health in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part; the term does not include labor and delivery. In the event a detainee requires invasive medical acts during transport for emergency medical care, Harris Health will dial 911 to request the Houston Fire Department dispatch an advanced life support (ALS) ambulance. Harris Health will not be responsible for paying the Houston Fire Department or for paying any bill received from a hospital, or freestanding emergency room, for the detainee's emergency medical care.

**Ground Ambulance.** Harris Health will contract with one or more licensed emergency medical service providers who operate basic life support (BLS) ambulances to transport detainees in need of acute, off-site medical care when transportation by other means is contraindicated.

**ATTACHMENT B-7: CARE OF PREGNANT DETAINEES**

Harris Health will ensure that pregnant detainees receive timely and appropriate prenatal and postnatal care and other medically necessary treatment, including specialized obstetrical care, prophylaxis, and the continuation of methadone therapy. For purposes of this Attachment, prenatal care includes medical examinations and laboratory and diagnostic tests (e.g., HIV testing). Harris Health will also educate pregnant detainees on appropriate levels of activity, safety precautions, and proper nutrition.

Harris Health will communicate any dietary or work related restrictions that a pregnant detainee may have to the Sheriff.

Harris Health will collect data required by state law for reports on pregnant detainees, such as the Texas Commission on Jail Standards Pregnant Inmate Report. The Pregnant Inmate Report will be submitted to the Sheriff or Sheriff's designee by the first day of each month.

**ATTACHMENT B-8: DETOXIFICATION**

Harris Health will provide necessary medical detoxification services to detainees with drug and/or alcohol addiction who are not experiencing severe, life-threatening withdrawal symptoms. These services will be provided under physician supervision in accordance with local, state, and federal laws. Further, Harris Health will coordinate with the Mental Health Provider who will provide a behavioral health services related to the detoxification of the detainee.

Harris Health will dial 911 to request the Houston Fire Department to dispatch an ambulance with ALS and will inform the Sheriff when a detainee is experiencing severe, life-threatening intoxication (overdose) or withdrawal, so that the Sheriff can arrange for a correctional officer to accompany or meet the detainee at a licensed acute care facility.

**ATTACHMENT B-9:**
**LONG-TERM, CONVALESCENT CARE AND CARE OF DISABLED DETAINEES**

Harris Health will staff the Detention Facility's infirmary and any other medical area designated to assist detainees with the activities of daily living with qualified medical professionals (e.g., nurse under supervision of registered nurse) that are stationed within ear- or eye-distance of detainees. If a medical professional determines that a detainee is acutely ill, the medical professional will notify the on-call physician so that the detainee can be seen by the physician as soon as possible. When appropriate, a physician will refer a detainee with one or more chronic conditions to specialty care providers for further consultation. Chronic conditions include, but are not limited to, cancer, seizures, HIV infection, hypertension, asthma, tuberculosis (TB) and diabetes.

**ATTACHMENT B-10: PHARMACY SERVICES**

Harris Health will lease space within the Detention Facility from the County to operate a Class C pharmacy that meets the needs of detainees. The Class C pharmacy will utilize appropriately licensed pharmacy staff to procure medications, accept prescription orders, fill prescription orders on-site, distribute medication to nursing stations and/or detainees, and store medication (including over the counter medications) under the proper conditions of sanitation, temperature, light, moisture, ventilation, segregation, and security, and dispose of medication. All controlled substances, syringes, and needles will be stored in compliance with the Sheriff's policy and procedures on security.

Except for detainees who have been booked into the jail with prescription medications that have been verified through the prescribing community clinician or pharmacy, no prescription medication will be dispensed unless prescribed by a Detention Facility provider. Medications will be dispensed per dose and not using a dose pack system.

Harris Health will develop and observe its own internal formulary, but shall include within the formulary medications that a detainee is taking at the time of booking or acceptable alternate medications, when clinically indicated. Harris Health will provide the formulary to the Sheriff and the Mental Health Provider and, when updates are made to the formulary, will notify the Sheriff and Mental Health Provider.

Upon a detainee's release, Harris Health may provide up to 7 days of medication to a detainee.

**ATTACHMENT B-11: CARE OF JAIL STAFF**

Harris Health will offer the following limited services to employees and contractors of the Jail:

**Emergency Treatment.** Persons employed or otherwise under contract with the County to perform services within the Detention Facility ("Jail Staff") will be treated in the event of an unexpected illness or injury which results in symptoms that require immediate care by a medical professional to prevent death or serious long term impairment. The goal of emergency treatment is stabilization. Harris Health will not provide prescription medication to Jail Staff unless such medication is necessary to render life-sustaining emergency treatment.

**ATTACHMENT B-12: CARE COORDINATION AND CASE MANAGEMENT SERVICES**

Harris Health will provide the following care coordination and case management services for detainees:

- Schedule appointments for detainees who appear to require follow-up assessment due to their stated or perceived health conditions at intake.
- Physicians will assess and evaluate detainees for acute and chronic care conditions that require coordination with the Mental Health Provider or specialty care providers outside the Detention Facilities.
- Qualified medical professionals will request pertinent protected health information about each detainee with a chronic condition from the Greater Houston Healthcare Connect and other providers who do not participate in the health information exchange.
- Upon admission to a local hospital, qualified medical professionals will consult with the admitting physician to ensure appropriate discharge planning is carried out and to prevent hospital readmissions.
- Link detainees with a medical home prior to their release from the Detention Facility.
- Respond to inquiries from community healthcare providers, either electronically or by telephone, who represent that they are treating a detainee who has been released from the Detention Facility.

**ATTACHMENT B-13: ADMINISTRATIVE SERVICES**

Harris Health will employ staff who are dedicated to managing the health care operations of the Detention Facility. At least three staff members shall be senior level managers and hold the following positions:

1. Chief Medical Officer
2. Administrative Director of Nursing
3. Vice-President of Operations

These staff members will ensure the following administrative support services or activities are provided:
- Human Resources (HR) functions, such as recruiting, orientation, training, and other personnel support services.
- Information Technology (IT) services to address hardware and software issues other than software issues related to the electronic medical record. There is a separate agreement in place between the Parties that covers support services for the electronic medical record.
- Legal advice for Harris Health employed staff that require guidance to perform their duties under this Agreement.
- Performance improvement activities that are informed by best practices in correctional health care.
- Reporting to the Sheriff and the County on the health care operations of the Detention Facilities.
- Development and implementation of a Quality Assurance (QA) Program that is designed to drive Continuous Quality Improvement (CQI). This QA Program will be separate and distinct from programs serving Harris Health System.

In addition, Harris Health will ensure mid-level managers and shift supervisors are assigned and present at the Detention Facility to direct the day-to-day health care operations and to verify that the necessary staff and patient support is available, respectively.

**ATTACHMENT B-14: HEALTH CARE SERVICES AND SUPPLIES NOT COVERED**

Harris Health is not responsible for the cost or provision of off-site health care services that are authorized by the County, the Sheriff, or a detainee's health insurance plan. Off-site health care services are services provided at non-Harris Health owned facilities that include, but are not limited to, in-patient hospitalization at any hospital, emergency room services at any hospital or freestanding emergency room, and specialty care. Moreover, Harris Health is not responsible for the cost or provision of any service not included in Attachments B-1 through B-13. For avoidance of doubt, the following health care services or supplies are excluded from the scope of this Agreement:

1. Care rendered as a result of a protective custody order for mental health services
2. Psychologic counseling services
3. Behavioral health
4. Intellectual disability
5. Social work
6. Abortion
7. Pediatric health care
8. Ambulatory and elective surgeries
9. Transplants
10. Chemotherapy, radiation, or other cancer treatment
11. CPAP machines
12. Prostheses
13. Contact lenses
14. Vision correction surgery
15. Hearing aids
16. Orthodontia
17. Dental implants
18. Gender reassignment surgery
19. Hormone treatment detainee not already started in the community
20. Any service not listed in Texas Health and Safety Code Section 61.028 or not otherwise encompassed by the Texas Commission on Jail Standards' health-related jail standards (*see e.g.*, 37 Tex. Admin. Code §§ 273.1-273.7) and the TCJS-approved Jail Health Services Plan (Attachment A-1)
21. Mechanical restraint of detainees; provided, however, qualified medical professionals will provide care, monitoring, and documented observations of restrained detainees in accordance with 37 Tex. Admin. Code § 273.6 if requested by the Sheriff or the Sheriff's designee

22. Prescription medication for more than three prescriptions a month or for any period longer than seven days following a detainee's release

**ATTACHMENT B-15: VALUE ADDED SERVICES**

Harris Health will provide the following value-added services:

1. Verification of a detainee's current insurance status.
2. Eligibility screening for Harris Health's Financial Assistance Program, Medicaid, Medicare, Healthy Texas Women Program, Social Security Income, CHIP, Health Insurance Marketplace, and other similar assistance programs.
3. Telemedicine consultations with specialty care providers on Harris Health's medical staff.
4. Environmental services.

**EXHIBIT B-15**

**ENVIRONMENTAL SERVICES CLEANING GUIDELINES**

**PURPOSE:**
To reduce the risk of hospital acquired infections from transmission between patients, personnel, in an overall healthcare environment;  To ensure standardized cleaning protocols that enhance our patient experience by providing a high level service to produces a clean, safe and healthy environment; and To foster collaboration between the hospitals' Infection Prevention Program and Environmental Services.

**POLICY STATEMENT:**

Harris Health System (Harris Health) Environment Services (EVS) contributes to the quality, safety, and aesthetics of our environment by providing regularly scheduled cleaning of most non-critical environmental surfaces under the guidance of our Infection Prevention policies.

**ELABORATIONS:**

The Environmental Services Department scope of services includes cleaning of inpatient and outpatient areas, public spaces and offices, garages and grounds, waste removal, floor maintenance, meeting room set ups, pest control oversight, cubicle curtain changing and other misc. duties.  Our cleaning processes are in alignment with our Infection Prevention policies and procedures. All cleaning products are pre-approved by the Infection Prevention Committee.

**DEFINITIONS:**

A.  CLEANING PROTOCOLS:
1. <u>Standard Precautions</u>: Non-critical surfaces are disinfected regularly following standard precautions unless notified of an isolation area.
2. <u>Isolation areas</u>: Isolation areas receive regularly scheduled cleaning. Occupied and discharged cleaning follow Infection Prevention guidelines.
3. <u>In-Between Case Cleaning/End of Day Cleaning and Terminal Cleaning</u>:  Perioperative area cleaning follows AORN standards and HHS Infection Prevention policies. "Terminal Cleaning" has also interchangeably been used to categorize "in-depth" cleaning for area such as new construction.

B.  GERMICIDAL DISINFECTANT: A EPA registered and Harris Heath Infection Prevention approved cleaning agent used to kill microorganisms.

C.  PERSONAL PROTECTIVE EQUIPMENT (PPE):  A physical protective barrier that prevents direct contact with body fluids or contaminated surfaces.  This includes gloves, gown, masks, respirators, face shields, hair covers, shoe covers, and leggings.

**PROCEDURES:**

See Appendix A – Harris Health Cleaning Responsibilities and Miscellaneous Tasks

See Appendix B – Operating Room Cleaning Checklist

See Appendix C – General Cleaning Procedures

**REFERENCES/BIBLIOGRAPHY:**

"Recommended practices for environmental cleaning", AORN Recommended Practices Advisory Board, November 2013.

Center for Disease Control Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008.

Harris Health System Policy and Procedures 1303 Pre-Cleaning, Sterilization, High and Low Level Disinfection, and Storage of Processed Patient Care Devices.

Harris Health System Policy and Procedures 3.55.11 Bloodborne Pathogen Post Exposure Prophylaxis Management.

Harris Health System Policy and Procedures 3003 Personal Protective Equipment.

Harris Health System Policy and Procedures 3000 Standard and Transmission Based Precautions.

Harris Health System Policy and Procedures 7201 Hazardous Materials and Waste, Chemicals: Handling, Packaging, Storage, Labeling and Disposal.

Harris Health System Policy and Procedures 7205 Medical Waste Disposal.

Harris Health System Policy and Procedures 7206 Medical Waste Disposal, Contingency Plan.

Harris Health System Policy and Procedures 3002 Pest Control.

**OFFICE OF PRIMARY RESPONSIBILITY:**

Harris Health System Environmental Services Department

**REVISION HISTORY:**

| Effective Date | Version # (If Applicable) | Review or Revision Date (Indicate Reviewed or Revised) | Reviewed or Approved by: (Directors, Committees, Managers, and Stakeholders etc.) |
|---|---|---|---|
| 05/09/2017 | 1.0 | Approved 05/09/2017 | Structure and Organizational Standards Committee |
| | | Appendix A revised | EVS Governance. |
| | 2.0 | Appendix A (Terminal Commode Cleaning) revised | EVS Governance (Taskforce) |
| | 3.0 | Appendix A Updated 09/17/2019; Added Appendix B | |
| | | 11/27/2019 Expedited Executive Approval via Rapid Cycle | SEVP/COO |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## APPENDIX A

| TASK | EVS | FNS | UNIT | SCM | BIOMED | ENG | LOGISTICS | HAZMAT | IT | PHARMACY | GUEST TRANS | NOTES/FREQUENCY: |
|------|-----|-----|------|-----|--------|-----|-----------|--------|----|----------|-------------|------------------|
| CURTAIN CHANGE | X | | | | | | | | | | | Every 6-months or when visibly soiled or per policy 3000 for iso patients |
| CURTAIN PURCHASE | | | | X | | | | | | | | as needed |
| CURTAIN HOOKS/TRACKS REPLACEMENT | | | | | | X | | | | | | as needed, Units submit ENG workorder |
| DIALYSIS SINK | | | X | | | | | | | | | daily and as needed |
| ELECTRICAL CLOSETS | | | | | | X | | | | | | as needed |
| EMERGENCY CENTER WAITING AREA | X | | | | | | | | | | | 3X per shift and as needed (includes seating) |
| EMERGENCY CENTER PUBLIC RESTROOMS | X | | | | | | | | | | | every 2 hours |
| EVS CARTS | X | | | | | | | | | | | weekly and as needed; EVS techs will not leave carts unattended with chemicals visible to the public. Carts will be locked anytime when out of line of sight, including when cleaning rooms. |
| EVS CLOSETS | X | | | | | | | | | | | weekly and as needed; ensure all chemicals are labeled and no personal items |
| EXAM ROOMS | X | | X | | | | | | | | | Unit - after each patient, between cases; EVS daily final clean |
| FLOOR CARE | X | | | | | | | | | | | follow specific pavillion floor care plan |

| TASK | EVS | FNS | UNIT | SCM | BIOMED | ENG | LOGISTICS | HAZMAT | IT | PHARMANCY | GUEST TRANS | NOTES/FREQUENCY: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IT CLOSETS | | | | | | | | | X | | | as needed |
| IV POLES, PUMPS & MONITORS | | | X | X | | | | | | | | Units wipe down and remove from patient rooms, SCM transport to central supply decon room and final clean |
| LIGHT COVERS (EXTERIOR) | X | | | | | | | | | | | weekly and as needed, check for bugs |
| LIGHT COVERS (INTERIOR) | | | | | | X | | | | | | as needed, unit or EVS submit workorder |
| LINEN | | | X | | | | | | | | | contracted service |
| LINEN CARTS | | | X | | | | | | | | | weekly and as needed |
| MEDICINE FRIDGE | | | | | | | | | | X | | weekly and as needed |
| MEDICAL EQUIPMENT | | | X | | | | | | | | | after each patient and as needed |
| MEDICAL WASTE (NON SHARPS) | X | | X | | | | | | | | | units/EVS place in soiled utility, EVS transports to medical waste trailer on dock |
| NOURISHMENT FRIDGE | | X | | | | | | | | | | weekly and as needed |
| OFFICE SPACE | X | | | | | | | | | | | Mon - Fri |
| PATIENT MEAL TRAY | | X | X | | | | | | | | | Unit will pick up late trays |

| TASK | EVS | FNS | UNIT | SCM | BIOMED | ENG | LOGISTICS | HAZMAT | IT | PHARMACY | GUEST TRANSP | NOTES/FREQUENCY: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PATIENT GOWN/LINEN CHANGING/REMOVAL | X | | | | | | | | | | | |
| PATIENT ROOM | X | | | | | | | | | | | daily and after discharge |
| PERIOPERATIVE SURGICAL SUITES | X | | | | | | | | | | | only terminal cleaning with UV-C application |
| PERIOPERATIVE SURGICAL SUITES (L&D) | X | | | | | | | | | | | daily terminal clean with UV-C and in between cases |
| PERIOPERATIVE LABS (CATH, GI, IR) | X | | | | | | | | | | | only terminal cleaning |
| PEST CONTROL | X | | | | | | | | | | | contract services |
| PORTABLE UNIT COMMODE | X | | X | X | | | | | | | | Unit wipes down before calling SCM for pickup, EVS will clean during room cleaning |
| RECYCLING | | | | | | X | | | | | | Logistics recycling schedule |
| RENTAL BEDS/EQUIPMENT | | | | X | X | | | | | | | units notify SCM when rental beds need to be picked up |
| SCRUB MACHINES | | | | X | | | | | | | | **Dispensers** – Clean outside of machine with Oxivir wipes weekly, inside should only be wiped with a clean and dry dust rag per manufacturer recommendations; **Receivers** – Clean outside of machine including deposit bin with Oxivir wipes weekly & clean inside machine with Oxivir wipes every time soiled linen is picked up (3 times daily) |

| TASK | EVS | FNS | UNIT | SCM | BIOMED | ENG | LOGISTICS | HAZMAT | IT | PHARMACY | GUEST TRANS | NOTES/FREQUENCY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHARPS REMOVAL | | | | | | | | X | | | | contracted services |
| SOAP/SANITIZER/LOTION DISPENSERS | X | | | | | X | | | | | | EVS refills as needed; ENG installs |
| SOILED UTILITY ROOMS | X | | | | | | | | | | | weekly and as needed |
| SPILLS | X | | | | | | | X | | | | see spill policy |
| SPILL PALLET/HAZMAT LABELS | | | | | | | | X | | | | call System Hazmat for pickup and replacement |
| STAIRWELLS | X | | | | | | | | | | | see specific pavilion cleaning plan |
| STERILE PROCESSING | X | | | | | | | | | | | only terminal cleaning |
| STRETCHERS | X | X | | X | | | | | | | X | Units/Guest Trans clean daily and in between patients; EVS/Guest Trans perform semi annual deep clean/detail; see pavilion specific plan per unit/month; call BioMed for repairs **(Pressure washing is not authorized as this causes rust and damages the equipment)** |
| SUPPLY ROOMS | X | | X | X | | | | | | | | daily and as needed |
| UNIT FALL ALARMS | | | | | X | | | | | | | notify BioMed if repairs needed |
| WAITING ROOMS | X | | | | | | | | | | | 3X per day or as needed |
| WARMERS | | | X | | | | | | | | | in between patients |
| WHEELCHAIRS | X | | X | | | | | | | | X | Units/Guest Trans clean daily and in between patients; EVS/Guest Trans perform semi annual deep clean/detail; see pavilion specific plan per unit/month; call BioMed for repairs **(Pressure washing is not authorized as this causes rust and damages the equipment)** |

| TASK | EVS | FNS | UNIT | SCM | BIOMED | ENG | LOGISTICS | HAZMAT | IT | PHARMACY | GUEST TRANSP | NOTES/FREQUENCY: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WINDOWS | X | | | | | X | | | | | | EVS cleans internal windows daily or as needed; annual contract service will pressure wash external lower level; higher level windows as directed by Executive Leadership/ENG; see specific pavilion cleaning plan |

**APPENDIX C**
**GENERAL CLEANING**

1.  Germicidal:  Proper Use of Disinfectant  (See Harris Health Policy and Procedure 1303 Pre-cleaning, Sterilization, High and Low Level Disinfection and Storage of Processed Patient Care Devices);
2.  Blood and Bodily Fluid Spills (See Harris Health Policy and Procedure 3.55.11 Bloodborne Pathogen Post Exposure Prophylaxis Management);
3.  Personal Protective Equipment (See Harris Health Policy and Procedure 3003 Personal Protective Equipment);
4.  Standard Precaution (Harris Health Policy and Procedure 3000 Standard and Transmission Based Precautions); and
5.  Waste:
    a.  See Harris Health Policy and Procedure 7201 Hazardous Materials and Waste, Chemicals: Handling, Packaging, Storage, Labeling and Disposal;
    b.  See Harris Health Policy and Procedure 7205 Medical Waste Disposal; and
    c.  See Harris Health Policy and Procedure 7206 Medical Waste Disposal, Contingency Plan.
6.  Pest Control – See Harris Health Policy and Procedure 3002 Pest Control.

## ATTACHMENT C

## POWER OF ATTORNEY

| | |
|---|---|
| (Name of registrant) | Harris County Sheriff's Department Clinic Pharmacy |
| (Address of registrant) | 1200 Baker Street                          Houston, TX 77002 |

(DEA registration number)    _____

I, Cherian A. Robinson (name of person granting power), the undersigned, who am authorized to sign the current application for registration of the above-named registrant under the Controlled Substances Act or Controlled Substances Import and Export Act, have made, constituted, and appointed, and by these presents, do make, constitute, and appoint the Harris County Hospital District d/b/a Harris Health System (name of attorney-in-fact), my true and lawful attorney for me in my name, place, and stead, to execute applications for Forms 222 and to sign orders for Schedule I and II controlled substances, whether these orders be on Form 222 or electronic, in accordance with 21 U.S.C. 828 and Part 1305 of Title 21 of the Code of Federal Regulations. I hereby ratify and confirm all that said attorney must lawfully do or cause to be done by virtue hereof.

_____(Signature of person granting power)

I, _____ (name of attorney-in-fact), hereby affirm that I am the person named herein as attorney-in-fact and that the signature affixed hereto is my signature.

_____(Signature of attorney-in-fact)

Witnesses:

1. _____ (Signature of witness)

2. _____ (Signature of witness)

Signed and dated on _____ (current date).

---

Notice of Revocation – to be completed only when Power of Attorney is revoked

The foregoing power of attorney is hereby revoked by the undersigned, who is authorized to sign the current application for registration of the above-named registrant under the Controlled Substances Act or the Controlled Substances Import and Export Act. Written notice of this revocation has been given to the attorney-in-fact _____ this same day.

_____ (Signature of person revoking power)

Witnesses:

1. _____ (Signature of witness)

65

2. _____ (Signature of witness)

Signed and dated on _____ (current date).

ORDER OF COMMISSIONERS COURT
Authorizing execution of an Agreement

The Commissioners Court of Harris County, Texas, convened at a meeting of said Court at the Harris County Administration Building in the City of Houston, Texas, on the __8th__ day of ____February____, 2022 with all members present except ___none_____.

A quorum was present.  Among other business, the following was transacted:

**ORDER AUTHORIZING EXECUTION OF AN AGREEMENT BETWEEN HARRIS COUNTY AND THE HARRIS COUNTY HOSPITAL DISTRICT D//B/A HARRIS HEALTH SYSTEM**

Commissioner _____Ramsey_____ introduced an order and made a motion that the same be adopted.  Commissioner ____Ellis_____ seconded the motion for adoption of the order.  The motion, carrying with it the adoption of the order, prevailed by the following vote:

| Vote of the Court | Yes | No | Abstain |
|---|---|---|---|
| Judge Hidalgo | ☑ | ☐ | ☐ |
| Comm. Ellis | ☑ | ☐ | ☐ |
| Comm. Garcia | ☑ | ☐ | ☐ |
| Comm. Ramsey P.E. | ☑ | ☐ | ☐ |
| Comm. Cagle | ☐ | ☑ | ☐ |

The County Judge thereupon announced that the motion had duly and lawfully carried and that the order had been duly and law-fully adopted.  The order thus adopted follows:

**IT IS ORDERED** that County Judge is hereby authorized to execute for and on behalf of Harris County, an Agreement with the Harris County Hospital District d//b/a Harris Health System for the Harris County Sheriff's Office to obtain and provide adequate medical care for detainees of the County's Detention Facilities. The Agreement is incorporated herein by reference for all purposes as though fully set forth word for word.

All Harris County officials and employees are authorized to do any and all things necessary or convenient to accomplish the purpose of this Order.

Presented to Commissioners Court

February 8, 2022

Approve: R/E